No. 2--00--0498

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE                                )   Appeal from the Circuit Court

OF ILLINOIS,                  )   of Lake County.

)

Plaintiff-Appellee, )

)

v.                                       )   No. 96--CF--1249

)

CARLOS ARROYO,                  )   Honorable

                  )   George Bridges,

Defendant-Appellant.                    )   Judge, Presiding.

_________________________________________________________________

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Carlos Arroyo, was convicted of first-degree murder (720 ILCS 5/9--1 (West 1996)) and was subsequently sentenced to 60 years' imprisonment.  This court reversed that conviction and sentence and remanded the cause for a new trial.  
People v. Arroyo
, No. 2--97--0158 (1998) (unpublished order under Supreme Court Rule 23).  Defendant was retried before a jury, was convicted, and was sentenced to 54 years' imprisonment.  This court reversed defendant's conviction  and remanded for new trial in 
People v. Arroyo
, 328 Ill. App. 3d 861 (2002).  Our supreme court denied the State's petition for leave to appeal but, under its supervisory authority, directed this court to vacate its opinion and reconsider its judgment in light of the substantial prejudice standard set forth in 
People v. Williams
, 192 Ill. 2d 548 (2000).  We now vacate our opinion pursuant to that order and file this opinion in its stead.

After reconsidering our judgment in light of 
Williams
, we now conclude that defendant did not suffer substantial prejudice as a result of the prosecutor's improper comments during opening statement.  Having so concluded, it is necessary to address defendant's second and third arguments on appeal.  We reject defendant's second and third arguments and, therefore, affirm the judgment of the circuit court of Lake County.

I. FACTS

During the State's opening statement, the prosecutor remarked  that Diana Zuniga, an eyewitness who testified at defendant's first trial, was serving a 20-year prison sentence.   Following the trial court's sustaining of defendant's objection to that remark, the prosecutor told the jury that Zuniga was convicted of being the getaway driver in this homicide.  Defendant objected to the remarks and moved for dismissal or a mistrial.  The motion was denied.  The propriety of these statements is contested on appeal.

At trial, the State called Kelly Peterson, who testified that on May 7, 1996, she saw a man in a brown jacket walking along Washington Street as she drove home from work.  According to Peterson, a man wearing a red, hooded sweatshirt jogged up behind the man in the brown jacket.  Peterson looked away and then heard a crash from the direction of the two men.  She looked back and saw the man in the red, hooded sweatshirt raise his right arm and fire two or three shots at the man in the brown jacket.  Peterson testified that she did not see the shooter's face but that he was about 5 feet 7 inches or 5 feet 8 inches tall, and shorter than the man who was shot.

Angela Demoe testified that she was working at Enterprise Car Rental on Washington Street on May 7, 1996.  Shortly after 6:15 p.m., she was pulling out of the Enterprise parking lot in a white Nissan Pathfinder.  Demoe noticed two men approaching.  One man was wearing a brown jacket and was walking along the curb.  The other man was wearing a red sweatshirt and approached at a diagonal, walking fast.  As Demoe turned out of the parking lot onto Washington Street, she heard two pops, which she thought were firecrackers.  At that point, Demoe looked into her rearview mirror and saw the man in the red sweatshirt heading back in the direction he came from.  Demoe saw the man in the red sweatshirt from about 25 feet.  At the time, it was still daylight and she made eye contact with him.  According to Demoe, the hood of the red sweatshirt was up tightly around the man's face, but she could see his eyebrows, eyes, nose, and mouth for five or six seconds.  Demoe said that the man in the brown jacket was taller than the man in the red sweatshirt, who was about 5 feet 3 inches or 5 feet 4 inches tall.  

On May 7, 1996, a detective showed Demoe an array of six photographs that did not include defendant's picture.  Demoe did not identify the shooter from any of the photographs but did indicate that one individual pictured looked similar to the man in the red sweatshirt.  On May 9, 1996, Detective Mark Tkadletz showed Demoe a different array of six photographs that also did not include a picture of defendant.  Demoe pointed to the man pictured in the lower left-hand corner of the array and indicated that she was pretty sure that was the man.  Later testimony established that she pointed to a picture of Juan Salgado.

On May 13, 1996, Detective Yancey showed Demoe yet another six-photograph array.  Demoe identified the man pictured in photograph No. 5 as the man in the red sweatshirt.  Demoe said that the man in photograph No. 3 was the same man she identified in the photograph array showed to her on May 9, 1996.  Demoe also said that the man pictured in photograph No. 5 was not in the first two arrays that were shown to her.  Later testimony established that defendant was the man pictured in photograph No. 5 and that Juan Salgado was pictured in photograph No. 3.  In court, Demoe identified defendant as the man she saw in the red sweatshirt on May 7, 1996.  On cross-examination, Demoe said that she may have told Detective Tkadletz on May 9, 1996, that she was 98% sure the man pictured in the lower left-hand photograph of the second array was the shooter.

Detective Thomas Luka testified that defendant gave a written statement to him and Detective Yarc on May 11, 1996.  The statement consisted of defendant's answers to the detectives' questions.  Defendant made no mention of the May 7, 1996, shooting in this statement. 

Detective Tkadletz testified that he and Detective Yarc interviewed defendant at noon on May 13, 1996.  Just before they interviewed defendant, Detectives Tkadletz and Yarc had obtained a videotaped statement from Juan Salgado indicating that defendant was the shooter.  When confronted with that information, defendant became upset, began raising his voice, and called the detectives liars.  Detective Tkadletz said that they then showed defendant the videotape of Salgado's statement naming defendant as the shooter.  Shortly thereafter, defendant demanded to be put back into his cell.

Sergeant Richard Davis testified that on May 13, 1996, at approximately 2:30 p.m., defendant knocked on his cell door and indicated that he was ready to tell the truth.  According to Sergeant Davis, Detectives Tkadletz and Yarc were at a meeting at the State's Attorney's office, so Sergeant Davis and Lieutenant Hendley took a statement from defendant.  Sergeant Davis identified the typed statement that defendant gave on May 13, 1996, at 2:40 p.m.  This statement was admitted into evidence and was read to the jury as follows:

"I'm not going to lie to you guys anymore.  I was with Juan Salgado, we were supposed to be going to pick up my cousin Diane [
sic
], and we were driving down Washington St. to Greenleaf and Juan saw a guy and said is that Fonzie.  I said  I don't know.  Instead of turning right on Greenleaf he turned left and came up behind him and as we drove by, Juan said ya that's Fonzie we got to take care of him.  I said no we have to pick up Diane [
sic
] at the dentist office.

We drove over to the dentist office where Diane [
sic
] works on Greenleaf, and we picked up Diane [
sic
].  I got into the backseat.  Juan then drove back to Washington St. and said where did he go, where did he go. ***  Juan drove to Washington and Teske and said where is he, where is he, do you see him.

I didn't see him, then Juan said there he is, and he turned right on Washington and then made a left at the first street.  Juan gave me the gun and said you take care of him.  I'm going down to 41 and I'll come back around and pick you up on this street.

Juan left and I saw Fonzie coming on Washington.  I just stood there and I couldn't do it, so I started walking back up that street toward Grand Ave.  Juan had pulled around and I got into the backseat and he said did you hit him.  I said no, but I told Juan that there was a police car by Waukegan Tire, so I couldn't.  Juan said your [
sic
] just scared.  And he drove back to Washington St. and turned into the next block after we passed Fonzie.  Juan said give me the gun I'll do it.

Juan got out of the car and he told Diane [
sic
] to drive and said go to the next street and turn left and pick me up by the apartments.  Diane [
sic
] and I were in the first driveway on that street across from where they are building that new building.  Juan was walking up toward Fonzie and I heard the shots and then saw Fonzie fall.  Fonzie then got up and fell again.

Diane [
sic
] turned into the street by the apartments, and then we saw this lady in a white truck, who we thought was watching Juan, so we made a u-turn on the street and went back to Washington St. and Juan was running through the grass toward the apartments.

We turned right and then turned right on the first street where we first dropped Juan off.  We pulled into the same driveway, and then Juan came running up to the car and got in and said I hit him.  I knew he hit him, cause I saw Fonzie drop.

Juan said lets [
sic
] go to Antioch, so we drove over by Wadsworth and got some water for Juan and we drove to Antioch."

In this typed statement, defendant also indicated that "Diane [
sic
]" is his cousin "Diane [
sic
]" Zuniga; that the gun was a .25-caliber automatic, and that "Fonzie" is Jose Soto.

According to Detective Tkadletz, at about 2:30 p.m. on May 13, 1996, he and Detective Yarc received a phone call at the State's Attorney's office informing them that defendant wanted to make a statement.  Detectives Tkadletz and Yarc returned to the Waukegan police station and spoke to defendant at approximately 3:30 p.m.  Detective Tkadletz said that they asked defendant to write out in full detail and in his own handwriting the events that he had related to Detectives Davis and Hendley.  Defendant's handwritten statement was admitted into evidence at trial and was substantially the same account he gave to Sergeant Davis and Lieutenant Hendley.  In his handwritten statement, defendant additionally indicated that at Salgado's direction he hid the gun in the basement of the house in which defendant was living in Zion.

Defendant took the detectives to the address in Zion and retrieved the gun.  After retrieving the gun, the detectives  returned with defendant to the Waukegan police department.  Detective Tkadletz said that he and Detective Yarc received information from Detective Yancey that Angela Demoe had identified defendant as the shooter.  According to Detective Tkadletz, when defendant was confronted with that information he put his head down and shortly thereafter said the words, "I shot him."  At that point, defendant told the detectives that it happened as he described in the handwritten statement except he was the shooter.  The detectives then had defendant go through the whole story again.  According to Detective Tkadletz, defendant declined an offer to write out another statement and told them, "I just want you guys to put it down and I will sign it."  At that point, Detectives Tkadletz and Yarc put together the information defendant provided and typed out defendant's statement.  Detective Tkadletz said that, after he typed out the statement, defendant appeared to read it, and then signed the statement.  Detective Tkadletz identified the statement that he typed out on May 13, 1996, at 6 p.m.; it was admitted into evidence at trial and reads as follows:

"Juan and I were in his purple Chevy Cavalier.  We were going to pick up my cousin, Diana[,] who was working in Park City.  Juan was driving and we were going down Washington St.  We stopped in at the dentist office and Diana said that she was going to be late.  We were hungry so we went to Wendy's in Gurnee.  Juan ordered and we went back to the dental office.  We were on Washington St., and we saw a guy in a brown jacket walking down the street.  Juan looked at me and said, 'That's him!'  Juan told me to get out and take care of this.  I said no because we had to pick up Diana at the office.  Juan then went to the dental office and picked up Diana while I stayed in the car.  I jumped into the back and Diana got in the front of the car.  We pulled out of the lot and turned left onto Greenleaf St.  He went up to [
sic
] streets and turned left. [H]e said, 'this isn't the road that I want to be on, I need to get on Teske.[']  He made a U-turn and turned left onto Greenleaf.  He went up to Belvidere and drove east to Teske.  He turned left onto Teske and went to Washington St.  We saw Fonzie walking and Juan said that you gotta take care of this.  Juan said that they, (the gang), would take care of me or my family if I didn't take care of this.  Juan dropped me off.  I had the .25 cal. gun with me as I got out of the car.  I don't know what road we were on.  I waited for Fonzie to get there.  I just couldn't do it so I walked up towards Grand where Juan said that he would pick me up.  When I got in the car he said, [']Did you hit him?[']  I said no.  I told him that I saw a police car pull into the parking lot of the tire place.  Juan told me that I needed to take car [
sic
] of this and that I knew why.  Juan pulled out onto Washington St., and turned left.  We passed Fonzie and turned left onto the next street.  I got out and waited for Fonzie to pass.  Juan said that he would pick me up on the next street.  I got out and started to walk up behind Fonzie.  I was wearing a red hooded sweatshirt and I pulled the hood over my head as I got closer to him.  I cut across the parking lot and ran up behind Fonzie.  That is where I shot him.  

After I shot him I ran back the way I came.  I was running across the parking lot when I saw a white truck.  I stopped for a moment and noticed that Juan had pulled a U-turn and went back out onto Washington St.  I ran through the apartments and over to the driveway off of the other street where they dropped me off.  I ran up to the car and got in on the passenger side of the car.  Juan was driving and he was driving the whole day.  I never saw Diana driving the car, but she could have switched with him when they turned around.  I got into the car and they backed out of the driveway.  We then drove towards Grand Av.  While we were driving I took off the red sweatshirt.  The sweatshirt was thrown out of the car as we passed some apartments.  We then drove to Antioch to see Robert and Ramon.

Carlos[,] did Diana know what you guys were going to do?

Yeah we told her when she got into the car.

Carlos[,] the gun that was recovered[,] was that the gun that you used to shoot Jose Soto?

Yes.

Carlos[,] is there anything else you can add to the statement?

No, that's it.

Carlos[,] now is this the truth about what happened.

Yes, I know I lied before, but this is the truth."

Detective Tkadletz further testified that, shortly after signing the statement, defendant began to cry and said that Salgado made him do it.  Defendant got down on one knee and asked for help and also asked if he could get probation.

Sergeant Robert Kerkorian testified that in May 1996, he was the supervisor of the Waukegan police department's gang unit.  According to Sergeant Kerkorian, Jose Soto was a self-admitted member of the Maniac Latin Disciples street gang, and defendant was a self-admitted member of the Latin Lovers.  Sergeant Kerkorian testified that in May 1996, the Latin Lovers were at war with the Maniac Latin Disciples.  Sergeant Kerkorian explained that, approximately a year before this shooting, a Maniac Latin Disciple killed a Latin Lover at a party in Chicago.  After that, the Latin Lovers and the Maniac Latin Disciples began shooting each other.  Also, in September or October 1995, the then-leader of the Latin Lovers, Francisco Aguillar, was shot.  According to the Waukegan police department's investigation, Soto was a suspect in the shooting of Aguillar.

The first witness called by the defense was Patrick Fischer, who testified that he was a manager at Enterprise Car Rental on May 7, 1996.  Fischer said that he observed a man in a red sweatshirt running eastbound on Washington Street on the day of the shooting.  Fischer said the man was a black male approximately 6 feet tall, 180 pounds, and in his late 20s or early 30s.  Fischer also said that he had a conversation with Angela Demoe on May 7, 1996, and she told him that she saw the man in the red sweatshirt get into a white Corolla or Corsica.

The defense also called Juan Morales, who testified that he is a member of the Latin Lovers street gang.  Morales said that he is a friend of defendant, and his sister has a child by defendant.  Morales also said that he is a friend of Juan Salgado.  In 1996, Morales was second in command of the Latin Lovers in Waukegan and Morales's cousin, Francisco Aguillar, was the leader.  Defendant was also a member of the Latin Lovers in 1996 and went by the name "Mouse" because he was short.  In 1996, Juan Salgado was the chief enforcer of the Latin Lovers in Waukegan, which meant that he was in charge of all the violent crimes for the gang.

Morales testified that on May 17, 1996, he had a conversation with Juan Salgado about the shooting of Jose Soto.  The conversation took place at Morales's cousin's house in Waukegan, and another Latin Lover named Freddy Zuniga was also present.  According to Morales, Freddy Zuniga telephoned Morales and said he was bringing someone over to speak to Morales.  Morales heard  Salgado in the background.  Morales set up a video recorder in the living room where it could not be seen.  Morales said that he set up the camera for his protection because he had heard that Salgado "tricked" on defendant to get out of jail, and Morales was afraid that Salgado was going to try to implicate him in the shooting.  Morales said that "tricked" meant to blame the murder on defendant.  Shortly after Morales set up the video camera, Freddy Zuniga and  Salgado came to the house.  At trial, Morales identified the videotape that he made of the conversation.  The videotape was admitted into evidence and played for the jury.

In the videotape, Salgado and Freddy Zuniga entered the house and Morales told Salgado to get out of his house.  Salgado repeatedly stated that he wanted to "explain" and at one point asked Morales, "Can you spare two minutes of your time, bro', before I break?"  Morales then told Salgado that he did not know why Salgado did what he did, and said, "You gonna blame the man on s--- that he didn't even f---ing do?" 

Morales said to Salgado that "you guys" killed "the guy," that Salgado blamed Mouse, and that Mouse said that Salgado threatened to kill Morales's sister.

Salgado again said that he wanted to explain, and continued, "Look, bro'.  I know if I got out, bro', if I put, you know, put the blame on him, I'll get out.  My parents would put the money up."  Salgado also said, "Look bro', look, I feel bad, bro', blaming this brother.  His birthday's f---ing coming up, you know."  Morales informed Salgado that defendant's birthday was "f---ing today."  Salgado said, "[B]ro', I know, bro', that's why I feel bad, bro'.  That's why I got to talk to you bro'.  He has a baby on the way, bro'.  You don't think I feel like s---?"  Salgado and Freddy Zuniga left the house, and the tape ended.

Morales said that when Salgado said he was going to "break" that meant he was going to leave the country.  When asked where Salgado was currently, Morales said that he was in Mexico.

Louise Battinus witnessed the shooting from her vehicle as she drove on Washington Street.  Battinus said the shooter wore a red nylon jogging coat.  Battinus was able to observe the shooter's face and described him as 5 feet 7 inches or 5 feet 8 inches tall and 175 to 180 pounds.  After observing defendant in court, Battinus said that defendant was "absolutely not" the shooter.  When Battinus was shown the videotape made by Morales, she identified Salgado as the shooter.

Defendant testified that on May 7, 1996, he and Juan Salgado were members of the Latin Lovers street gang.  Salgado was "chief security," meaning that he was responsible for all of the shootings and violence of the gang.  On the day in question, Salgado and defendant went in Salgado's purple Cavalier to pick up defendant's cousin Diana Zuniga at the dental office where she worked.  Upon learning that Zuniga was not ready to leave work, Salgado and defendant drove to a Wendy's restaurant.  On their way back to pick up Zuniga, Salgado saw a person in a brown jacket walking along Washington Street and asked defendant if the person was Fonzie.  Defendant said that he did not know.  Salgado turned around to get another look, and then said that it was Fonzie.

According to defendant, Salgado gave him a hooded sweatshirt and told him to put it on.  Defendant put the hooded sweatshirt on and then Salgado reached under the seat, pulled out a gun, and said, "[H]ere, take this and take care of business."  Defendant understood Salgado to mean he should go and shoot Jose Soto.  Defendant told Salgado "no," indicating that they had to go pick up Zuniga from work.  Defendant said that they picked up Zuniga, at which point he got into the backseat, Zuniga sat in the front passenger seat, and Salgado continued to drive.

Defendant testified that, after relocating Soto, Salgado told him to get out of the car and take care of Soto.  Salgado told defendant to go near some bushes, wait for Soto to come by, and take care of him.  Salgado gave defendant a gun and said that he would pick him up when he was done.  Defendant said that he went to the bushes but could not do it because he had never shot anyone before.  Defendant said that when Salgado picked him up he lied to Salgado, saying that there was a policeman nearby so he did not shoot Soto.  Salgado turned around and looked at him and said, "[Y]ou are just scared, give me that," and Salgado snatched the gun from him.  Defendant explained that if he had told Salgado that he just could not do it, Salgado would have done something to him.  Salgado pulled into a driveway, turned around, and said, "[G]ive me that hood."  Defendant said that he took the sweatshirt off and gave it to Salgado.  According to defendant, Salgado turned around, pointed the gun at him, and said, "I will take care of you later."

Defendant further testified that Salgado got out of the car and told Zuniga to drive.  Salgado ran toward Washington Street.  Zuniga pulled out of the driveway, and when they got back onto Washington Street, defendant saw Salgado run up behind Soto and shoot him.  Salgado returned to the car and said, "[L]ets [
sic
] go, drive toward Antioch."  Defendant said that he did not leave after Salgado left the car because Salgado threatened him, his family, and his pregnant girlfriend.

Defendant said that he was arrested on May 10, 1996.  He was placed in a holding cell at the Waukegan police department, and Detectives Luka and Yarc came and talked to him the next morning.  Defendant said that he initially failed to be truthful with the detectives because, after the shooting, Salgado pulled him and Zuniga aside and told them what to say in the event they were questioned by the police.

A couple of days later, Detective Yarc told him that Salgado blamed him for the murder.  Detective Yarc showed defendant a videotape of Salgado saying that defendant was the one who killed Jose Soto.  Defendant testified that he got upset, asked for an attorney, and said he did not want to speak to the detectives anymore.  Defendant was put back in a cell where he saw Salgado walk past with a detective.  Defendant stated that Salgado laughed when he saw defendant.  A couple of minutes later, defendant started to bang on his cell door.  Defendant told the sergeant that he wanted to tell the truth and that he was not going to lie anymore.  Defendant testified that he told Lieutenant Hendley and Sergeant Davis that Salgado shot Jose Soto.  Defendant identified the typed statement Lieutenant Hendley and Sergeant Davis prepared and indicated that he signed the typed statement and that it was the truth.

Defendant testified further that at 3:30 p.m. that same day, Detectives Tkadletz and Yarc asked him to write a statement by hand.  Defendant wrote out a statement indicating that Salgado shot Soto.  Defendant identified his handwritten statement, said that he signed it, and that it was the truth.  According to defendant, the detectives told him that they already had an eyewitness that identified Salgado as the shooter and that they were thankful for his help, and they asked if he knew where the gun used to shoot Soto was located.  Defendant indicated that the detectives told him that he would be charged only with mob action because they had an eyewitness that said Salgado was the shooter.  Defendant said that the detectives told him that if he took them to the gun they would take him to bond court when they got back.  Defendant took the detectives to the house where he lived and showed them the place in the basement where Salgado had hidden the gun.

Defendant said that when they returned to the Waukegan police department, Detective Yarc came in and said, "Okay, well, Carlos, we have a problem."  Detective Yarc said that they had one person saying that she saw Salgado do the shooting and that defendant's statements were consistent with that account.  Yarc also said, "[O]n the other hand, Salgado says you did the shooting and there are eyewitnesses saying they saw you do the shooting."  According to defendant, Detective Yarc began telling him to tell the truth.  Defendant testified that he told the detectives that he already told them the truth.  The detectives kept telling him that he was lying.  Defendant testified that at 6 p.m. Detectives Yarc and Tkadletz gave him another typed statement and told him that it was his handwritten statement all typed up.  Defendant said that he signed the statement without reading it and that no one read it to him.  Defendant also said that the detectives told him that after he signed the statement he would be taken to bond court and released.

After resting defendant's case, one of defendant's attorneys stated for the record that they did not call Diana Zuniga as an exculpatory witness, even though she was called to exculpate defendant and corroborate defendant's testimony in the first trial, because of the comments made by the State in its opening statement that she was convicted as the getaway driver and was sent to prison.  The defense renewed its motion to dismiss or for a mistrial, arguing that the State's comments during its opening statement shifted the burden of proof and rendered defendant unable to call an exculpatory witness.  When asked to further explain defendant's position, one of defendant's attorneys said:

"But now in [the jurors'] minds, the bottom line is well, if she just drove the car and they convicted her and they sent her to prison, well, yes, [defendant] was in the car, I guess if they convicted her, I guess we better convict [defendant]. *** Even if in good faith they thought for sure we were going to call her, there is not a person in this room that doesn't know that you can never bring up imprisonment; impeachment of a prior if she testifies is solely as that.

You can bring up the fact that she was convicted of a crime and now obviously within the case law about the specific  crime versus say a felony, but that is it, I can't go into sentencing or anything else."

The trial court denied the defendant's motion to dismiss or for a mistrial, and characterized the decision not to call Zuniga as trial strategy.  In addition to arguing that defendant was the person who shot Jose Soto thereby causing his death, the State argued that defendant was accountable for the actions of Salgado, if Salgado was the shooter, and was therefore guilty of first-degree murder by accountability.  The jury was given an accountability instruction over defendant's objection.

After deliberating, the jury found defendant guilty of first- degree murder, signing the verdict form indicating the finding was based on defendant's own actions, not on his accountability for the acts of Salgado.  The trial court sentenced defendant to 54 years' imprisonment.  Defendant appeals his conviction.

II. DISCUSSION

Defendant makes three arguments on appeal: (1) that the prosecutor made improper comments during opening statement; (2) that the prosecutor made improper comments during closing argument; and (3) that he was denied the effective assistance of counsel at trial.

A. Opening Statement

Defendant argues that the comments made by the prosecutor during the State's opening statement deprived him of a fair trial.  An opening statement may include a discussion of the evidence and matters that may reasonably be inferred from the evidence.  
People v. Smith
, 141 Ill. 2d 40, 63 (1990).  Counsel may summarily outline  the expected evidence and reasonable inferences from the evidence, but no statement may be made in opening that counsel does not intend to prove or cannot prove.   
People v. Kliner
, 185 Ill. 2d 81, 127 (1998).   Reversible error occurs only where the remarks, referring to evidence that later proves to be inadmissible, are attributable to the deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant.  
Kliner
, 185 Ill. 2d at 127.

During the State's opening statement, the prosecutor made the following remarks:

"You are going to hear evidence in this case, ladies and gentlemen, about the two other gang members that were with the defendant that day; Juan Salgado and a woman named, Diane [
sic
] Zuniga.  They were also members of the Latin Lovers street gang, same gang as the defendant.

You are going to hear evidence that Diane [
sic
] Zuniga and Juan Salgado too were involved in the shooting.  Diane [
sic
] Zuniga is going to testify, she is currently in prison serving a twenty year sentence."

At that point in the State's opening statement, defense counsel posed an objection and asked to be heard outside the presence of the jury.  Defense counsel argued that informing the jury that Zuniga was serving a sentence was improper and that even if Zuniga testified and was impeached with her conviction, it would be improper to disclose her prison sentence to the jury.  The defense moved for a mistrial based on prosecutorial misconduct.  The trial court sustained the objection but denied the motion for a mistrial.  The jury was not advised of any of these arguments, motions, or rulings.  The trial court then instructed the jury that what the attorneys say in opening statements is not evidence.  

Next, the prosecutor said:

"You will hear evidence, Diana Zuniga is expected to testify in this case.  She has been convicted of being the get-a-way [
sic
] driver of this homicide."

At that point, defense counsel objected again and asked to be heard outside the presence of the jury.  The State informed the trial court that it did not intend to call Zuniga as a witness.  The trial court sustained the defendant's objection and told the prosecutor not to talk about Zuniga.  Defense counsel again moved for a mistrial.  That motion was denied.  The trial court did not inform the jury of its ruling on the objection, nor did the trial court advise the jury to disregard the comment.  The prosecutor continued with his opening statement without further mentioning Zuniga.  The defense renewed its objection to the remarks the State made during opening statement multiple times during the trial and moved for a mistrial based on prosecutorial misconduct.  The trial court denied the motion each time.

Defendant contends that the above comments deprived him of a fair trial because (1) they amounted to deliberate misconduct and substantially prejudiced defendant by alleging facts that were not produced at trial; (2) they concerned improper impeachment of a potential defense witness and undermined the presumption of innocence; and (3) they were improper comment on the possible sentence defendant was facing.  The State contends that the prosecution, in good faith, expected Zuniga to testify and exculpate defendant as she did at defendant's first trial and, therefore, she would be properly impeached with her conviction of murder.

We begin by noting, as did the trial court, that the State's remark that Zuniga was serving a 20-year prison sentence was improper.  This is so because it disclosed or suggested the potential sentence defendant faced if the jury found him guilty.  The specific sentence received by an accomplice is properly excluded where such disclosure would reveal the possible sentence facing defendant.  
People v. Brewer
, 245 Ill. App. 3d 890, 892 (1993).  A jury is the trier of fact and does not have the responsibility of imposing a sentence; therefore, the possible penalty facing defendant is irrelevant and immaterial to the jury.  
People v. Lake
, 61 Ill. App. 3d 428, 431 (1978).  These concerns are addressed in Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000): 

"You are not to concern yourself with possible punishment or sentence for the offense charged during your deliberation.  It is the function of the trial judge to determine the sentence should there be a verdict of guilty."

Having determined that the prosecutor's first remark was improper, we now turn to a discussion of the second remark.  At the time of its opening statement, the State was not entitled to conclude that it would be permitted to impeach Zuniga with her prior conviction.  The rule for impeachment by prior conviction adopted in 
People v. Montgomery
, 47 Ill. 2d 510 (1971)
, including its balancing test, applies to impeachment by prior conviction of witnesses other than the accused.  See 
Montgomery
, 47 Ill. 2d at 516 (the then-proposed Federal Rule of Evidence 609 (51 F.R.D. 315, 393 (1971)) that was adopted in 
Montgomery
 speaks to impeachment of witnesses).  In this case, neither party moved 
in
 
limine
 for a determination of the admissibility of Zuniga's prior conviction to impeach her testimony.  Therefore, even if the State assumed that defendant was going to call Zuniga, it was presumptuous to mention an impeaching conviction in the opening statement when there had not been a determination by the trial court, as required by 
Montgomery
, that the probative value of the conviction was not substantially outweighed by the danger of unfair prejudice (
Montgomery
, 47 Ill. 2d at 516-19).

If we were to assume for the sake of argument that Zuniga's prior conviction would have been admissible to impeach her testimony, it would have been improper to disclose to the jury that Zuniga's murder conviction arose out of the same incident as did the allegations of murder against defendant.  It is well settled that evidence of an alleged accomplice's conviction of an offense for which the defendant is being tried is inadmissible as proof of the guilt of the defendant.  
People v. Sullivan
, 72 Ill. 2d 36, 42 (1978).  "A defendant who is separately tried is entitled to have his guilt or innocence determined upon the evidence against him without being prejudged according to what has happened to another."  
Sullivan
, 72 Ill. 2d at 42. 

In clarifying the 
Sullivan
 ruling that an accomplice's testimony can be impeached with that accomplice's prior conviction of the same offense for which the defendant is on trial, our supreme court explained that 
Sullivan
 "merely articulates the holding in  *** 
Montgomery
" and is "limited to the defined standards set forth in *** Federal Rule 609."  
People v. Stover
, 89 Ill. 2d 189, 195 (1982).  In other words, 
Sullivan
 does not provide a basis to admit a prior conviction to impeach a witness independent of the rule stated in 
Montgomery
.  See 
Stover
, 89 Ill. 2d at 195.

Unlike a defendant, who can be impeached only with the public record of his conviction during the State's rebuttal case (
People v. Coleman
, 158 Ill. 2d 319, 337 (1994)), convictions of witnesses other than the accused may be proved on cross-examination (
People v. Roche
, 389 Ill. 361, 368-69 (1945); 
People v. Kellas
, 72 Ill. App. 3d 445, 450 (1979)).  Generally, the limit to which a witness may be impeached on cross-examination with prior convictions is the introduction of certified copies of the convictions.  
People v. Enoch
, 146 Ill. 2d 44, 55 (1991)
.  The trial court has the discretion to inquire into any matters appearing in the public record, including the court, date, nature of the offense, and sentence received.  
Enoch
, 146 Ill. 2d at 55.  Care must be taken, however, to delete irrelevant and prejudicial surplusage such as the details of the nature of the crime of which the witness was convicted.  See 
People v. Dudley
, 217 Ill. App. 3d 230, 232 (1991).  If the details appearing on the documents necessary to authenticate a prior conviction are unfairly prejudicial, their admission might constitute an abuse of the trial court's discretion.  
People v. Johnson
, 173 Ill. App. 3d 998, 1012-13 (1988).  We fail to see how  the trial court could have concluded, in the exercise of its discretion, that Zuniga's impeachment should include informing the jury that she was convicted of being the getaway driver in this incident.

A prosecutor may impeach the testimony of a former codefendant or accomplice by informing the jury that the codefendant or accomplice has previously been convicted of a crime.  See 
Sullivan
, 72 Ill. 2d at 42.  This is so even in a situation where the facts and circumstances of the impeaching offense are the same as those that give rise to the charges for which the defendant is on trial.  In this situation, however, even though the impeaching offense may be designated by name (
here,
 first-degree murder), it cannot be identified as having any connection to the charges pending against the accused (in this case, that the conviction was the result of the witness acting as the getaway driver in the same incident).

Accordingly, we conclude that had Zuniga been called by defendant, the State may have been able to impeach her with her prior conviction of first-degree murder, if the 
Montgomery
 balancing test was met, but it would have been improper to disclose to the jury that the prior first-degree murder conviction was for 
this
 
murder
.  The State's comment during its opening statement that Zuniga "has been convicted of being the get-a-way [
sic
] driver of this homicide" was therefore improper.

The State argues that if the prosecutor's comment during its opening statements was error, we should find it to be harmless because defendant was not substantially prejudiced due to the trial court's sustaining of defendant's objection and its admonishments to the jury that opening statements are not evidence.  We agree that defendant did not suffer substantial prejudice as a result of the complained-of remarks, but we conclude that there are additional reasons for reaching this result.

In 
Williams
, our supreme court stated:

"Even if prosecutorial comment exceeds the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant [citation], taking into account 'the content and context of the language, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial' (
Kliner
, 185 Ill. 2d at 152).  '[E]rrors in opening statements or closing argument must result in substantial prejudice such that the result would have been different absent the complained-of remark before reversal is required.'  
People v. Cloutier
, 156 Ill. 2d 483, 507 (1993)."  
Williams
, 192 Ill. 2d at 573.

In this case, defendant's defense incorporated the factual proposition that Zuniga was the getaway driver and Salgado was the shooter.  Therefore, the challenged remark that "she has been convicted of being the get-a-way [
sic
] driver of this homicide" buttressed defendant's case.  While defendant's guilt might have been prejudged according to Zuniga's fate, as the rule in 
Sullivan
 attempts to prevent (see 
Sullivan
 72 Ill. 2d at 42), if the jury in this case were to conclude that Zuniga was in fact the getaway driver in this homicide, such conclusion supports defendant's version of the facts.  Moreover, as the different scenarios in this case unfolded, if Salgado was the shooter, Zuniga was the getaway driver.  By finding defendant guilty as a principal, that is, guilty as the shooter rather than as an accomplice to Salgado's act of shooting, the jury demonstrated that it was unswayed by the prosecutor's reference to Zuniga as the getaway driver.

Defendant's attorney concluded that Zuniga, who had given exculpatory testimony at defendant's first trial, was tainted by the prosecutor's opening remarks to such a degree that he was unable to call her as a defense witness.  However, the improper remarks in and of themselves did not bar the defense from calling Zuniga.  Defendant remained free to do so.  Any prejudice that  resulted from not calling Zuniga as a defense witness was the result of the decision not to call her.  It was defendant's attorney's assessment of the effect of those remarks that prompted him to exercise his discretion to forego calling Zuniga as a witness.

In any event, we cannot conclude that had Zuniga taken the witness stand she would have changed the outcome of the trial.  It is important to keep in mind that, even with Zuniga's testimony, defendant was convicted in his first trial.  And unlike Zuniga's testimony at defendant's first trial, where she testified while murder charges were pending against her, Zuniga's testimony in this case would have been subject to impeachment for her conviction of first-degree murder.

The trial court informed the jury before and during opening statements that opening statements are not evidence.  Also, the jury received a written instruction indicating that opening statements are not evidence and that any statement made that is not based on the evidence should be disregarded.  Illinois Pattern Jury Instructions, Criminal, No. 1.03 (3d
 ed. 1992).  The giving of this instruction alone is not always curative, but it is a factor to be considered in determining the prejudice to defendant.  
People v. Flax
, 255 Ill. App. 3d 103, 109 (1993).  It is also important to consider that there was evidence other than Zuniga's testimony, including Louise Battinus's testimony and the videotape made by Morales, to corroborate defendant's trial testimony. 

Based on these observations, we cannot conclude that the prosecutor's improper comments during opening statement led to substantial prejudice such that the result of this trial would have been different.  See 
Williams
, 192 Ill. 2d at 573.

B. Closing Argument

The material in this section is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

 
[Nonpublishable material under Supreme Court Rule 23 removed here.] 

C. Ineffective Assistance of Counsel

Defendant's last argument on appeal is that he was denied the effective assistance of counsel where his attorney failed to call Diana Zuniga as a witness even though she had testified at defendant's first trial that Salgado was the shooter.  The State contends that the decision not to call Zuniga was a matter of trial strategy made with defendant's consent and, therefore, defendant's ineffective assistance of counsel argument is without merit.  We agree with the State.

To succeed on his claim of ineffective assistance of counsel, defendant must show (1) that "counsel's performance was deficient" in that "it fell below an objective standard of reasonableness," and (2) that the "deficient performance prejudiced the defense" such that defendant was deprived of a fair trial whose result was reliable.  
Strickland v. Washington
, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984).  The failure to satisfy either prong of the 
Strickland
 test precludes a finding of ineffective assistance of counsel.  
People v. Patterson
, 192 Ill. 2d 93, 107 (2000).

With respect to the first prong of 
Strickland
, defendant must overcome a "strong presumption" that his counsel's conduct falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy. 
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.  Strategic choices made by defense counsel following a thorough investigation into the law and facts relevant to a defendant's plausible options are virtually unchallengeable.  
Strickland
, 466 U.S. at 687-91, 80 L. Ed. 2d at 693-95, 104 S. Ct. at 2064-66; 
People v. Mitchell
, 189 Ill. 2d 312, 347 (2000); 
People v. Towns
, 182 Ill. 2d 491, 514 (1998).  Accordingly, "[c]ounsel's decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel." 
People v. Richardson
, 189 Ill. 2d 401, 414 (2000).  Counsel's performance is measured by an objective standard of competence under prevailing professional norms.  
People v. Smith
, 195 Ill. 2d 179, 188 (2000).

Defendant points to 
People v. King
, 316 Ill. App. 3d 901, 913 (2000), and the cases cited therein, for the proposition that  counsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he or she is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense.  In 
King
, the court held that trial counsel's failure to call an available alibi witness who would have bolstered an otherwise uncorroborated defense was the result of incompetence because trial counsel failed to provide an explanation for failing to call the exculpatory witness and the court could not conceive of any sound trial strategy for failing to do so.

King
 is distinguishable from this case because defendant's testimony that Salgado was the shooter was not uncorroborated in the absence of Zuniga's testimony.  In defendant's first two written statements given to the police on May 13, 1996, defendant related that Salgado was the shooter.  There was the videotape made by Morales that showed Salgado implicating himself as the shooter and admitting that he falsely blamed defendant.  Lastly, Louise Battinus testified that defendant was "absolutely not" the shooter and identified Salgado as the shooter. 

King
 is also distinguishable because the defense in this case provided a specific explanation as to why Zuniga was not called.  After defendant rested his case, one of defendant's attorneys made the following comment:

"We are resting, but I want for the record to make clear that we did not call Diane [
sic
] Zuniga and as was pointed out throughout the trial and throughout the months that she has been in custody here pursuant to the writ that we asked this court to issue, she was going to be called in this case as an exculpatory witness, as a witness that testified this last time this case was brought to trial and in fact corroborated the testimony as put forth by [defendant] at that time, and I would ask judicial notice be taken of what her testimony was in that prior trial.

The only reason she is not being brought to testify at this time is because of the comments because of the--by the State's Attorney's office in their opening statement in which they made mention that she would be called as a witness, she in fact was convicted as the getaway driver in this case, she in fact went to prison because of that.

Number one, I objected at that point, I asked for a mistrial at that point based upon prosecutorial misconduct.  Subsequent to that, I asked that the case, not only there be a mistrial but that there--it be dismissed because of that prosecutorial misconduct, because at one point the prior witness as I set forth on the record, I was precluded to do a proper impeachment of her because I didn't want to go into a prior proceedings for fear that the jury might think it was that trial of Diane [
sic
] Zuniga because the State's Attorney said she was convicted of it.  Even though she pled guilty, he made it sound as if there was a trial, I couldn't take the chance of letting them think she was convicted for merely driving the automobile.  We could not put her on.

What they did when they made those comments knowing that they were not going to call her themselves, knowing--in fact they made the statement, they were under the impression we were going to call her.  What it did there is shift the burden of proof.  As you know, we don't have to put on any case.  For them to make comments on what we might do, we don't have any burden.

Between that, and again now, there is a 6th
 Amendment problem with ineffectiveness of counsel.  We are precluded from calling her.  They are both due process issues.  She is an exculpatory eye witness to this offense he is charged with, which we are now barred, in our opinion, from calling her based upon the State's comments."

The jury found defendant guilty.  Looking at the case in hindsight, one could speculate that it would not have hurt defendant's case to put Zuniga on the stand.  However, this is not the appropriate test.  The Supreme Court warned in 
Strickland
:

"It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.]  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  
Strickland
, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. 

It was not outside the realm of reasonable defense strategy to conclude at the time of trial that Zuniga, who was impeachable with a first-degree murder conviction, was so incredible that it was better not to call her.  This is an even more reasonable conclusion where there was other evidence admitted at trial corroborating defendant's testimony such as the videotape, which was not admitted at defendant's first trial, and defense counsel knew from the previous trial that defendant was found guilty in spite of Zuniga's exculpatory testimony.  Defendant is entitled to competent representation, not perfect representation.   
People v. Stewart
, 104 Ill. 2d 463, 491-92 (1984).  Other defense attorneys may have advised differently, but we cannot say that counsel's decision was so irrational and unreasonable that no reasonably effective defense attorney, facing the same situation, would have decided that defendant was better off submitting the case to the jury without Zuniga's testimony.

We also conclude that defendant has not established the prejudice prong of 
Strickland
.  In light of the previously noted
 
problems with Zuniga's testimony and the other evidence corroborative of defendant's trial testimony, defendant has failed to show that the failure to call Zuniga prejudiced his case such that he was deprived of a fair trial.

III. CONCLUSION

For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

HUTCHINSON, P.J., and BYRNE, J., concur.