NOTICE
Decision filed 05/30/17. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2017 IL App (5th) 130576

NO. 5-13-0576

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 02-CF-212 |
| | ) | |
| JOE C. TUCKER, JR., | ) | Honorable |
| | ) | David K. Overstreet, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Chapman and Barberis[*] concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Joe C. Tucker, Jr., filed a *pro se* petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)). Appointed counsel filed an amended postconviction petition, alleging ineffective assistance of trial and appellate counsel. The State filed a motion to dismiss the amended petition, and the motion was granted by the trial court. The defendant filed a timely appeal, asserting that the trial court erred in dismissing his amended petition without a third-stage evidentiary hearing,

_____

[*]Justice Stewart was originally assigned to participate in this case. Justice Barberis was substituted on the panel subsequent to Justice Stewart's retirement and has read the briefs and listened to the recording of oral argument.

1

when the defendant had alleged sufficient facts to make a substantial showing that his constitutional rights had been violated. For the reasons that follow, we reverse the order of dismissal and remand the matter for an evidentiary hearing.

¶ 2                              BACKGROUND

¶ 3     This appeal is taken from the circuit court's decision to dismiss the defendant's amended postconviction petition at the second stage of postconviction proceedings. The facts of this case are set forth in this court's disposition of the defendant's direct appeal. *People v. Tucker*, No. 5-06-0484 (2011) (unpublished order under Supreme Court Rule 23). Accordingly, we will restate only those facts relevant to our resolution of the issues raised in this appeal.

¶ 4     The evidence at trial established that on the morning of May 6, 1988, Jeff Reynolds, Jana's husband, returned home from his job on the night shift and found Jana lying on the bed covered in blood. She had been stabbed multiple times. A thermal underwear bottom and gray panties were hanging from her left ankle, and her thermal top had been pushed up. She was dead. Her purse was on the living room floor, with its contents dumped out.

¶ 5     During the investigation, the police interviewed a number of individuals, including Albert McDaniels and the defendant. Albert McDaniels went to the police station and voluntarily gave samples of hair, pubic hair, saliva, and blood. A forensic technician compared small hair fragments found on Jana's bed sheet to McDaniels' head and pubic hair standards, and determined that there was no DNA match. The defendant also provided samples of hair from his head. A forensic scientist compared the samples taken

2

from the defendant's head with the hair fragments recovered from the crime scene. The forensic scientist testified that the defendant's hair sample did not match the hair fragments at the scene. The scientist further stated that he did not have hair from the defendant's other body parts to compare with the hair fragments obtained from the crime scene, and because of that, the defendant could not be excluded as a suspect. By December 1988, the police had followed more than 300 leads, but the case remained open.

¶ 6    In August 2001, the Mount Vernon police department began to reexamine the physical evidence found at the scene of Jana's murder. Using an alternate light source that was not available during the original investigation, a detective found previously undiscovered stains on the thermal bottoms and panties Jana was wearing at the time of her death. Cellmark, a private laboratory, determined that the stains on the thermal bottoms and panties were from seminal fluid. Cellmark developed a DNA profile from the stains and found that the DNA profile was from an unknown male source. The unknown DNA profile was compared to a DNA profile from McDaniels, and it did not match. No physical evidence linking McDaniels to the inside of Jana's house was found.

¶ 7    Cellmark also created a DNA profile of the defendant, using the hair samples he had provided to the police in 1988. Cellmark found that the defendant's DNA matched the stains on Jana's thermal bottoms and panties. Investigators obtained a current sample of the defendant's DNA. Cellmark tested that sample and confirmed that the DNA sequences were the same. The defendant was arrested and subsequently charged with Jana's murder.

¶ 8    In November 2002, the State's Attorney telephoned police investigators and advised that he had received a letter from a prisoner named Robin Gecht. In the letter, Gecht claimed to have information about Jana's death. Investigators interviewed Gecht, who stated that the defendant had approached him to help prepare a defense for the defendant's case. Gecht told the defendant to write out his involvement with the case, and he wrote out four statements, providing more details in each successive version. Subsequently, the police obtained the statements from Gecht.

¶ 9    During trial, Robin Gecht testified that he had been convicted of aggravated battery, aggravated kidnapping, rape, deviant sexual assault, and attempted murder. Gecht admitted that he sent a letter to the State's Attorney stating that he had information about Jana's murder and suggesting that they could work out an agreement helpful to all concerned. Gecht testified that no one from the prosecution or law enforcement had offered him a deal in exchange for his testimony. Gecht stated that the defendant admitted he entered Jana's house with the intent of raping her and burglarizing the home, and that he killed her. Gecht testified that he asked the defendant to write down what had occurred, and that he asked the defendant to rewrite the statement four times, including more details each time. Gecht stated that he helped the defendant with one statement, constructing a theory of defense that his friend, McDaniels, had killed Jana, while he observed. Gecht acknowledged that he had seen four pieces of discovery.

¶ 10    Gecht denied tricking the defendant into writing the statements. During cross-examination by the defendant's counsel, the following occurred:

4

"MR. BURKE [defense counsel]: Did you trick [the defendant] into writing these statements?

GECHT: No, sir.

MR. BURKE: Do you remember talking with me and Kevin McClain back in November?

GECHT: Yes, sir.

MR. BURKE: No other questions, Your Honor."

¶ 11    Kevin McClain testified that he was a private investigator. Defense counsel asked McClain if Gecht said that he had tricked the defendant into writing the signed statements. The State objected on hearsay grounds because defense counsel had not asked Gecht any questions about the content of his conversation with McClain. The court sustained the objection.

¶ 12    Albert McDaniels testified that on May 5 or 6, 1988, he was near Jana's house because he was going to rob the house next door. McDaniels stated that he walked by Jana's house and looked in the window. He asserted that he had difficulty remembering anything from that time period. Defense counsel handed McDaniels a copy of a statement he had given to the police on May 11, 1988. McDaniels was asked if that was his signature on the bottom of each page, and he answered in the affirmative. When asked if it was his handwriting, he stated that he did not write it. Defense counsel asked that the statement be allowed into evidence as a past recollection recorded. The State objected on the ground that no foundation had been laid, and the trial court sustained the objection. Defense counsel continued asking McDaniels questions about May 5 or 6, 1988, and he

5

claimed not to remember. Defense counsel asked that McDaniels be made a court's witness. The State objected on the ground that he could not be declared a hostile witness until he showed some hostility. The court stated that it would not allow McDaniels to be questioned as a court's witness because he had not shown any hostility. Defense counsel then gave McDaniels a transcript from his testimony in July 1989, to refresh his memory. McDaniels stated that reviewing his testimony only refreshed his memory somewhat, but that the prior testimony indicated that he and an individual named "T.C." had a discussion about robbing a "dope house." McDaniels implied to T.C. that he and Jana had had an affair. McDaniels told T.C. the best time to go to Jana's house if he wanted to have sex with her was between 11 p.m. and 7 a.m. because her husband would be at work. McDaniels denied killing Jana.

¶ 13    Defense counsel requested again that McDaniels be declared a hostile witness. The State objected on the ground that McDaniels was answering the questions. The court replied:

> "Mr. Burke, you may—you may question this [witness] as if he's being cross examined. There's a proper way that you need to ask someone questions; however, and you're not doing it the proper way. So you need to move on and do it the correct way. But you may cross examine him at this time."

¶ 14    McDaniels denied that he stopped by Jana's house and looked in the living room window while the defendant looked in the kitchen window. He also denied telling the defendant that they could go into Jana's house, have sex with her, and look for money for

6

drugs.

¶ 15    Alva Busch testified that he had worked for the Illinois State Police as a crime scene investigator for 24 years. In 2001, he retired and opened an agency that reviewed criminal cases. Defense counsel showed Busch a crime scene drawing generated by the Illinois State Police. Defense counsel told Busch that the defendant gave a statement that he looked in the kitchen window and saw Jana lying on the couch. Defense counsel asked Busch to draw a line from the kitchen window to the couch. The State objected on the ground that the drawing was not to scale. Defense counsel argued that it was just demonstrative. The State argued that the defense was trying to use a diagram that was not to scale to establish that it was impossible to see Jana lying on the couch from the kitchen window. The trial court sustained the objection.

¶ 16    The defendant took the stand, and defense counsel asked him about his convictions for aggravated battery and burglary. The defendant stated that one night while he was out, he went to a gas station for a soda, but had no money. When he told the cashier that he planned to rob him, the cashier laughed, and he threw the soda at the cashier.

¶ 17    The defendant testified that he and Jana worked together at a Wendy's restaurant in 1982 or 1983 and that they began a sexual relationship in about 1983. He testified that on May 5, 1988, he borrowed his sister's car to go to Jana's house. He parked about two blocks away and walked to her house. He testified that as he approached her house, McDaniels stepped out from beside it, claiming to have been just walking around. They both went to the door, and he introduced McDaniels to Jana. They spent about 15 minutes

7

talking in the living room. He stated that he and Jana went into her bedroom and started to engage in sexual intercourse. McDaniels came into the bedroom and asked if "it was a party," and Jana said "no." He stated that McDaniels left the room and then returned, saying "Fuck this shit." The defendant testified, "I had already came at the time and I was getting up and then he just ran into the bedroom and started grabbing on her, pulling on her." The defendant pushed McDaniels off Jana. The defendant testified that McDaniels then pulled a knife, stabbed Jana, and threatened to kill him. The defendant ran away. He claimed to have seen McDaniels later that morning, and McDaniels threatened to kill him if he said anything. The defendant testified that he did not say anything to the police because he was afraid.

¶ 18    The defendant testified that he met Gecht in prison. The defendant stated that he had questions he wanted his attorney to ask some potential witnesses. Because his handwriting was poor, he asked Gecht to type the questions for him. He testified that Gecht told him that he could help with his defense. The defendant admitted writing the statements that the State offered into evidence and said that he had written them for Gecht to help him with his defense. The defendant testified that after he wrote the first statement, Gecht told him to write another one with more detail. He stated that he wrote the statements because his attorney had told him that the police knew that McDaniels was at the scene, but could not place him in the house. He testified that Gecht told him to write a statement putting himself in McDaniels' place to show the police how they missed McDaniels. He stated that in writing the statements, he took everything he knew about the case, and everything he learned from discovery, and tried to rebuild a crime

8

scene.

¶ 19 The jury found the defendant guilty of all 10 counts of first degree murder. Following the sentencing hearing, the trial court stated that the defendant would be sentenced on the most serious charge, the offense of first degree murder in that he, without lawful justification and with the intent to kill Jana, stabbed her with a sharp instrument, thereby causing her death, and the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (count VI). The court then sentenced the defendant to natural life imprisonment on count VI, and vacated the other convictions.

¶ 20 The defendant filed a motion to reconsider sentence and a motion for a new trial, both of which were denied. As previously noted, the defendant's conviction and sentence were affirmed on appeal. *People v. Tucker*, No. 5-06-0484 (2011) (unpublished order under Supreme Court Rule 23). The defendant then filed a *pro se* petition for relief from judgment pursuant to section 2-1401(f) of the Code of Civil Procedure (735 ILCS 5/2-1401(f) (West 2010)). The circuit court *sua sponte* dismissed the petition, and the defendant appealed. This court affirmed the dismissal. *People v. Tucker*, 2012 IL App (5th) 100190-U.

¶ 21 The defendant then filed a *pro se* postconviction petition. Appointed counsel filed an amended postconviction petition alleging ineffective assistance of trial and appellate counsel. The State filed a motion to dismiss the defendant's postconviction petition, arguing that the defendant failed to meet the *Strickland* standard for ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). The court granted the State's

motion to dismiss. This appeal followed.

¶ 22                                           ANALYSIS

¶ 23    On appeal, the defendant contends that the trial court erred in dismissing his postconviction petition at the second stage of the proceedings. The defendant argues that the errors made by trial counsel so permeated his trial that it is impossible to conclude that the allegations in the amended petition, when liberally construed in light of the trial record, failed to make a substantial showing of a constitutional violation.

¶ 24    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a process through which a defendant can assert that his conviction resulted from a substantial deprivation of his rights under the United States Constitution or the Illinois Constitution. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). A postconviction petition is a collateral attack on a prior conviction, the purpose of which is to allow inquiry into constitutional issues related to the conviction or sentence that were not, and could not have been, determined on direct appeal. *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, issues that were raised and decided on direct appeal are barred under the principle of *res judicata*, and issues that could have been presented on direct appeal, but were not, are considered waived. *Barrow*, 195 Ill. 2d at 519.

¶ 25    Postconviction proceedings may potentially proceed through three stages. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006). At the first stage, the trial court may summarily dismiss a petition if it finds that the petition is frivolous and patently without merit. *Pendleton*, 223 Ill. 2d at 472. At the second stage, counsel may be appointed for an indigent defendant. *Pendleton*, 223 Ill. 2d at 472. Postconviction counsel's obligations

10

under Illinois Supreme Court Rule 651(c) include (1) consulting with the defendant to ascertain his contentions of deprivation of constitutional rights; (2) examining the record of the trial proceedings; and (3) amending the petition, if necessary, to ensure that the defendant's contentions are adequately presented. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013); *Pendleton*, 223 Ill. 2d at 472. At the second stage, it is the defendant's burden to make a substantial showing of a constitutional violation, and the State may move to dismiss the petition for failure to do so. *Pendleton*, 223 Ill. 2d at 472-73. In determining whether the defendant has made a substantial showing of a constitutional violation, all well-pleaded facts in the petition, not positively rebutted by the record, are to be taken as true. *Pendleton*, 223 Ill. 2d at 473. Where, as here, the trial court dismisses the postconviction petition on the State's motion, without an evidentiary hearing, the trial court's decision is reviewed *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 26 A defendant has a right to effective assistance of counsel under the United States Constitution (U.S. Const., amend. VI) and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). *People v. Leeper*, 317 Ill. App. 3d 475, 481 (2000). A defendant alleging a violation of his right to effective assistance of counsel must generally meet the two-pronged test set out in *Strickland,* 466 U.S. at 687. *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984). Under *Strickland*, the defendant must allege facts demonstrating (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance so prejudiced the defendant that he was denied a fair trial. *Strickland*, 466 U.S. at 687-88; *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). In establishing substandard performance, the defendant must overcome the strong

11

presumption that his attorney's actions were the product of sound trial strategy and not incompetence. *Nowicki*, 385 Ill. App. 3d at 81. A defendant is entitled to competent, not perfect, representation, and mistakes in trial strategy or judgment will not, of themselves, render the representation ineffective. *Nowicki*, 385 Ill. App. 3d at 82. In establishing the prejudice prong, the defendant must show that there is a reasonable probability that, but for his attorney's deficient performance, the result of the proceedings would have been different. *Barrow*, 195 Ill. 2d at 520. A reasonable probability is one that sufficiently undermines confidence in the outcome of the proceeding. *Barrow*, 195 Ill. 2d at 520.

¶ 27 To prevail on a claim of ineffective assistance, both prongs of *Strickland* must be satisfied. *Coleman*, 183 Ill. 2d at 397. Thus, a court may resolve an ineffective assistance claim based upon only the prejudice component because a lack of prejudice renders irrelevant the issue of counsel's performance. *Coleman*, 183 Ill. 2d at 397-98.

¶ 28 On appeal, the defendant contends that his trial counsel's errors so permeated every phase of the trial that there can be no confidence in the jury's verdict. Initially, the defendant notes that the State's evidence, particularly the DNA evidence and the defendant's incriminating written statements, led his counsel to pursue a three-part defense strategy: (1) the defendant had been having an "on again off again affair" with Jana, and that he had consensual sex with her on the night of her murder; (2) the actual killer was Albert McDaniels; and (3) Gecht had tricked the defendant into writing the incriminating statements. The defendant concedes that his counsel successfully presented evidence that the defendant had consensual sex with Jana, through the defendant's own trial testimony. The defendant asserts, however, that his counsel failed to present

12

evidence in support of the remaining theories of defense due to counsel's lack of understanding of basic rules of evidence, violations of pretrial rulings, and incompetence in trial advocacy.

¶ 29    Specifically, the defendant alleges that his counsel (1) violated the court's order granting a motion *in limine* limiting the introduction of Gecht's criminal history, (2) disregarded evidentiary rules in describing the details of his prior conviction, (3) failed to lay a proper foundation to impeach Gecht and establish that Gecht tricked him into writing the incriminating statement, (4) failed to attempt to perfect impeachment of McDaniels with any of McDaniels' inconsistent statements; (5) failed to know the rules of evidence when introducing a diagram, and (6) made an improper closing argument in which counsel focused on his own performance, discussed an offensive interpretation of the evidence, and referenced prejudicial information. The defendant asserts that the substandard performance left him unable to present his theory of the case and prejudiced him to the point that he suffered a constitutional deprivation of his right to counsel. The defendant also alleges ineffective assistance of appellate counsel. We will consider each contention in turn.

¶ 30    Initially, the defendant argues that counsel's lack of courtroom awareness was evident during the pretrial hearing when counsel offended the trial court by suggesting that defense motions were routinely denied when the State offered an objection and that the defense motions were granted only when the State agreed to them. We note that this exchange between counsel and the trial court occurred outside the presence of the jury and thus could not have biased the jurors. *People v. Young*, 248 Ill. App. 3d 491, 502

13

(1993). The defendant has not alleged nor argued that the trial judge developed a bias against the defendant as a result of this exchange. In fact, the defendant concedes that this instance alone would not be sufficient to establish ineffective assistance of counsel. Instead, he contends that this conduct foreshadowed counsel's refusal to comply with pretrial orders and his lack of understanding of the rules of evidence.

¶ 31 Next, the defendant asserts that his counsel violated an order *in limine* prohibiting the defense from discussing the details of one of Robin Gecht's criminal convictions. The defendant notes that during opening statements, defense counsel told the jury that Gecht was serving time for attempted murder and deviant sexual assault, and then stated: "we'll get into the particulars of that deviant sexual assault." The State objected that counsel's comment violated the order *in limine*, and the objection was sustained. During a sidebar, the trial court admonished defense counsel that he could ask about Gecht's prior conviction, but he could not delve into the particulars of that case.

¶ 32 A witness may be impeached on cross-examination with prior convictions, but the details of the nature of the crime are irrelevant and prejudicial surplusage. *People v. Arroyo*, 339 Ill. App. 3d 137, 151-52 (2003). In this case, defense counsel's comment, during opening statement, that he would reveal the details of Gecht's deviant sexual assault conviction, suggests that counsel either did not understand the order *in limine* or did not plan to abide by it. In our view, this incident, standing by itself, does not satisfy the prejudice prong of *Strickland*. In other words, the defendant cannot show that but for defense counsel's comment, there is a reasonable probability that the result of the trial would have been different.

14

¶ 33 The defendant also asserts that his counsel disregarded the evidentiary rule restricting the admission of details underlying a prior conviction of a defendant. Prior to commencement of opening statements, defense counsel had not yet received a ruling on a motion *in limine*, which included a paragraph seeking to prohibit the State from referring to the defendant's prior bad acts and prior convictions. During a conference outside the presence of the jury, and just prior to opening statements, the State indicated that it did not intend to refer to the defendant's prior convictions during opening statements because the motion had not yet been ruled upon. During its opening statement, the State refrained from any comment on the defendant's prior convictions. Curiously, defense counsel, during his opening statement, proceeded to inform the jury that the defendant had been convicted of a crime in Champaign. He stated that the defendant:

"was in a convenience store. He got a Coke out of the freezer or out of the refrigerator, took it up to the counter, didn't have any money. He told the guy behind the counter that he was going to rob him. The guy behind the counter laughed. Joe hit him with the Coke can, then the two guys in the store jumped over the counter, held Joe down until the police got there. So Joe ended up with a felony conviction and went to prison. While he was out of prison and on parole, these charges were brought up and so a parole hold was put on him and he was put back in prison. While he was in prison, that's when he hooked up with Robin Gecht."

¶ 34 The defendant later testified in his own defense. Responding to questions by his own counsel, the defendant explained that he was arrested for a parole violation and

15

subsequently sent to prison at Menard, where he met Robin Gecht. The defendant asserts that defense counsel's errors during his opening statements, and during his questioning of the defendant, unfairly prejudiced the defense because the jury was needlessly given some details of a prior conviction, which included violence, and was permitted to speculate as to the extent of the injury caused when the clerk was struck with the Coke can.

¶ 35 Our courts have voiced concerns that providing proof of an accused's "penchant for criminal behavior would control the decision-making process, resulting in convictions based upon past guilt instead of current evidence." *People v. Fletcher*, 335 Ill. App. 3d 447, 449 (2002). "While evidence of prior criminality cannot be admitted for the purpose of proving criminal propensity, it is allowed to be used, on occasion, after an accused testifies." *Fletcher*, 335 Ill. App. 3d at 449. Whether a prior conviction can be used against the defendant requires a process of balancing its probative value as impeachment against the unfair prejudice it might impose. *People v. Montgomery*, 47 Ill. 2d 510, 518-19 (1971). Simply put, the details of the defendant's actions as described by his counsel during opening statement would not have been admissible under any interpretation of *Montgomery*, unless the defendant took the stand and testified to same. In this case, the defendant admitted to being on parole and then returned to prison for the parole violation, but he did not provide details of the prior conviction during his testimony. Thus, it was only the defendant's attorney who described, in detail, the circumstances that led to the defendant's prior conviction in Champaign County.

¶ 36 Further, the defendant has questioned his counsel's understanding of when the

16

State can properly introduce evidence of a defendant's prior criminal history. Based on the record, it seems that defense counsel was unaware of the limitations placed upon the admissibility of prior criminal convictions under the *Montgomery* rule, and the trial court's obligation to perform a balancing test under circumstances as set forth herein, where the defendant testifies and the State seeks to introduce prior convictions. Defense counsel made no objection to the State's motion to admit the defendant's prior conviction for unlawful delivery of a controlled substance, a crime that was unrelated to the facts of this case. Inasmuch as defense counsel made no objection, the trial court did not perform any analysis, as required by *Montgomery*. In some circumstances, counsel's decision to inform a jury of a prior conviction shows competence by attempting to blunt its impact with the jury, but the details of the nature of past crimes are irrelevant and prejudicial surplusage. *Arroyo*, 339 Ill. App. 3d at 151-52. The defendant contends that defense counsel either was unaware of or ignored the *Montgomery* rule and that his counsel's repeated introduction of the prejudicial details of the defendant's past criminal history before the jury constitutes ineffective assistance of counsel.

¶ 37   Judicial scrutiny of counsel's performance is highly deferential, and there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *People v. Manning*, 241 Ill. 2d 319, 334 (2011). It is the defendant's burden to overcome the presumption that, under the circumstances, counsel's challenged action might be considered trial strategy. *Manning*, 241 Ill. 2d at 334. "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335. Given the record

17

before us, we are unwilling to assume that defense counsel's decision to describe the details of the defendant's aggravated battery conviction, and to allow the defendant to testify regarding his past criminal activity, was sound trial strategy. This information may have influenced the jury's verdict. These allegations, supported by the trial record, make a substantial showing that the defendant's constitutional rights may have been violated.

¶ 38    The defendant also argues that his counsel was ineffective in that he failed to lay a proper foundation to impeach Gecht. The defendant asserts that his counsel erred during cross-examination of Gecht because counsel stopped one question short of laying a proper foundation to impeach Gecht's testimony that he had not tricked the defendant into writing the statements confessing to Jana's murder. Defense counsel asked Gecht whether he remembered speaking with defense counsel and McClain, the private investigator. Gecht responded in the affirmative. Defense counsel then stated "No further questions." Next, defense counsel called McClain as a witness and asked him about his conversation with Gecht. Specifically counsel asked McClain whether Gecht had admitted that he tricked the defendant into writing the incriminating statements. The State objected on hearsay grounds, arguing that defense counsel had not asked Gecht any questions about the content of his conversation with McClain. The trial court sustained the objection. The defendant argues that defense counsel never asked the court if he could recall Gecht to lay the proper foundation, even though the trickery was a cornerstone of the defendant's explanation in defense of the incriminating statements. The defendant asserts that counsel's failure to lay this foundation was unfairly prejudicial to his defense because the defendant was unable to present testimony from his witness, McClain, to

18

corroborate the defendant's testimony that he was tricked by Gecht into writing incriminating statements. Without this testimony, the defendant argues that the jury was left to determine whether the defendant or Gecht was more credible on this issue.

¶ 39    The record at trial shows that both Gecht and the defendant had credibility issues. Gecht had been impeached by his criminal record. And while Gecht did not receive a deal in exchange for his testimony, he readily admitted that he wrote to the State's Attorney, claiming to have information about Jana's murder in hopes of working out some agreement that would be helpful to "all concerned." Gecht testified that the defendant told him that he had entered Jana's house with the intent of raping her and burglarizing her house and that he had killed her. During cross-examination by defense counsel, Gecht denied that he had tricked the defendant into writing the statements. But defense counsel failed to take the extra steps necessary to lay the ground work for impeaching Gecht with McClain's testimony. Inasmuch as the defendant's claim of deception in the authoring of the incriminating statements was a key component to the defendant's trial strategy, we are not willing to assume that defense counsel's failure to lay the groundwork for the impeachment of Gecht was sound trial strategy. The testimony of McClain may have influenced the jury's verdict. The defendant's allegations, supported by the trial record, make a substantial showing that the defendant's constitutional rights may have been violated.

¶ 40    The defendant argues that defense counsel was ineffective because he never tried to perfect his impeachment of McDaniels with any of McDaniels' inconsistent statements, even though McDaniels' testimony was replete with instances where he

19

claimed not to remember and where he denied things he had said in previous statements. The defendant argues that getting McDaniels' prior inconsistent statements into evidence was critical to his defense because the police had identified McDaniels as the alternate suspect, and the jury deserved to have a full understanding of McDaniels' viability as the perpetrator of the murder. He further asserts that, after watching defense counsel struggle to lay a proper foundation to introduce McDaniels' prior inconsistent statements, the trial court allowed counsel to question McDaniels as a hostile witness, even though he showed no hostility, highlighting counsel's lack of knowledge of the rules of evidence.

¶ 41    The trial record shows that defense counsel was able to establish that McDaniels was serving time in prison for armed robbery at the time he testified. After defense counsel failed to lay the foundation to admit McDaniels' May 11, 1988, statement to the police as a past recollection recorded, he attempted to use that document to refresh McDaniels' memory. McDaniels reviewed the statement, but stated that it did not really refresh his memory. Defense counsel then asked McDaniels if he remembered giving sworn testimony in July 1989, and McDaniels stated that he did not remember. McDaniels was asked if he remembered saying he was at Jana's house on the night of the murder. He replied that he could not remember if he said he was at her house, but he did recall saying he was near the house, because he was going to rob the house next door. McDaniels denied stopping at Jana's house while heading to rob the house next door. He testified that he cut through Jana's yard and looked in the window as he passed. Defense counsel handed him three pages from the transcript of his July 1989 testimony. He read them and stated that they refreshed his memory somewhat. Defense counsel asked him if

20

he discussed robbing the house with T.C., and he stated that he did. Defense counsel asked McDaniels if he knew Jana, and he said no. Defense counsel handed McDaniels pages from his July 1989 testimony to refresh his memory. McDaniels stated that it did not really refresh his memory, but, if that is what he said, "then that's about as close that it get[s] to what really happened back then." He was asked if he had been to a party at Jana's house, and he said not that he remembered. He admitted testifying to having been at a party at her house and that he had implied to T.C. that he and Jana had an affair. He testified that he no longer remembered, but at the time of his July 1989 testimony, he stated that he had told T.C. that the best time to go to Jana's house to have sex was between 11 p.m. and 7 a.m. because her husband would be at work.

¶ 42    McDaniels also testified that he voluntarily cooperated with the police when they asked for blood, hair, saliva, and the clothes he was wearing on the night of the murder. He stated that every time the police asked if they would find his DNA in the house, he stated they would not. McDaniels reviewed his testimony from July 1989 and admitted that he had testified that he knew Jana slightly through a friend who may have worked with her and that he had been to her house once for a small party, with just a few people. He said he was introduced to her, but did not speak with her. He stated that any implications that he was having an affair with her were false. He denied killing Jana, denied that he was in the house at any time on the night she was killed, and denied that he had any contact with her other than at the small party.

¶ 43    Based upon the testimony in the trial record, it appears that defense counsel was able to impeach McDaniels with prior inconsistent statements. McDaniels had difficulty

21

remembering statements he had made to the police years earlier. Defense counsel asked McDaniels to verify if he had made the statements, and defense counsel was then able to either refresh McDaniels' memory with his prior statements or was allowed to read from the statements. Defense counsel was also allowed to question McDaniels as a hostile witness and was thus allowed to ask leading questions through cross-examination. The record establishes that defense counsel was able to introduce the defense theory that McDaniels was the perpetrator of the crime. McDaniels admitted that he was near Jana's house and looked in the window. He admitted to being in the area to rob the house next door. He admitted that he made a statement to the police allowing a friend to believe that he had an affair with Jana and that he had told his friend that the best time to have sex with Jana would be between 11 p.m. and 7 a.m. when her husband was at work. He admitted that he had lied to his friend about having an affair with Jana. While he denied knowing Jana, he admitted that he had told police that he had been at a small party at her house. He also admitted that statements he had made earlier to the police would have been more accurate. He stated that it was possible that he had told the police some things in May 1988 that were not completely true.

¶ 44    Impeachment is not evidence. *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47. Impeachment simply challenges the credibility of the witness and, ultimately, it falls to the trier of fact to determine whether that challenge was successful. *Douglas*, 2011 IL App (1st) 093188, ¶ 47. "[A] court of review will not upset a verdict by a jury on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible." *Douglas*, 2011 IL App (1st) 093188, ¶ 47. Defense

22

counsel was able to show that McDaniels made inconsistent statements, and the question of credibility was left to the jury to determine who was more credible—the defendant or McDaniels. Accordingly, the defendant has failed to make a substantial showing that his defense was unfairly prejudiced by his counsel's failure to properly impeach McDaniels.

¶ 45     The defendant next argues that defense counsel was ineffective for failing to know the rules of evidence when introducing a diagram to establish line of sight. Defense counsel hired an expert witness, Alva Busch, to recreate the crime scene. Defense counsel attempted to elicit testimony from Busch that it was impossible to see Jana lying on the couch, from the kitchen window, as testified to by McDaniels. Defense counsel also attempted to elicit testimony from Busch that the defendant could not have seen Jana lying on the couch from the kitchen window as the defendant claimed in his statement. The defendant argues that defense counsel failed to properly prepare a diagram for use as substantive evidence and that counsel's error prevented him from offering substantive evidence to support his theory that McDaniels was in the victim's house on the night she was murdered.

¶ 46     In this case, defense counsel retained a well-qualified expert, who had years of experience with the Illinois State Police as a crime scene investigator, to offer testimony to support the defense theory that McDaniels had to have been in the house to know that Jana was lying on the couch. Inexplicably, counsel failed to properly prepare a diagram of the house and yard, including sight lines, so that this evidence could be introduced through the testimony of Busch. The defendant contends that, as a result of counsel's error, he was deprived of critical evidence that supported his theory that McDaniels was

23

the perpetrator of the crime. The defendant's allegation, supported by the trial record, is sufficient to make a substantial showing that his constitutional rights may have been violated.

¶ 47     In this case, the allegations in the defendant's petition, and the supporting record, regarding counsel's inability to introduce this evidence and counsel's other errors, make a substantial showing that counsel's representation was deficient and that counsel's deficient performance may have resulted in unfair prejudice.

¶ 48     Next, the defendant contends that by the end of the trial, even defense counsel recognized his performance was deficient. Defendant notes that counsel began his closing argument with the words, "Not guilty. Joe Tucker is innocent of killing Jana Reynolds. Albert McDaniels killed Jana Reynolds." The defendant suggests that these words are important because they support his contention that the trial strategy to be used in his defense was to show that McDaniels killed Jana.

¶ 49     Shortly thereafter, defense counsel offered the following description of his legal performance:

> "Years ago I tried being a—a trial lawyer for a while. And my memory I was pretty good at it. Last Monday put the light to that. I was so nervous last Monday and I'm nervous now but not like last Monday. Last Monday I was so nervous I couldn't hardly speak.
>
> I retired, if you will, from being a trial lawyer and I—and I became more what you might have a research lawyer and that's how I end up learning so much about DNA. I'm a DNA guy.

When I agreed to help [the defendant] on this case, I thought it was a DNA case and it turned out it wasn't. So here I am. I might have said during voir dire about how I've been on a jury before. It was a criminal case down in Benton in Federal Court. For as tough as it is on this side of the railing—(Physical indication)—to me it's a whole lot tougher over on this side of the railing. (Physical indication).

In that case it was obvious to all of us on the jury that one lawyer was better than the other. When we got back to the jury room nobody even mentioned it. When we got back to the jury room we started to look at the evidence. I think that you guys are going to do the same thing; but, if there's any doubt, please don't judge this case on who has the better lawyer. That wouldn't be fair because [the defendant is] going to lose on that ground."

Defense counsel's admission to the jury that he may not have been as good a lawyer for the defendant as the attorney representing the State is somewhat confounding. It is conceivable that a lawyer may try to endear himself or herself to the jury as a matter of trial strategy, but the extended admission did not end with defense counsel's request that the jury treat the defendant fairly. Instead, defense counsel revisited it later in his argument, telling the jurors:

"And, by the way, I have—I have decided that I'm going to re-retire from being a trial lawyer. I—I find it just too stressful. But while Albert McDaniels was on the stand last Friday, I wanted to quit that day. I wanted to quit that morning. I wanted

25

to quit being [the defendant's] lawyer. I wanted to quit my job. I wanted to turn in my law license."

When the State objected to this argument, the judge asked defense counsel to "move on."

¶ 50   The defendant also directs us to that portion of defense counsel's argument about a wet spot found on the murder victim's bed. Defense counsel, in describing this spot, used a somewhat bizarre example. He explained to the jury:

"But let's talk about the wet spot. Okay. And I'll give you my example of that. When I was married, my wife had a bird. It was some kind of little parrot and we always thought it was a female. You can't really tell with birds until we gave it a little fuzzy bear that was about it's [*sic*] own size. And then it turned out that it—it was actually a male bird. And my wife asked me to clean it up and I asked her why am I the expert on the wet spot? Just because there's semen on thermal underwear, if somebody moves, the semen doesn't leak off the thermal underwear."

It is unclear, based upon the trial record, what point defense counsel was attempting to make with this example.

¶ 51   When talking about McDaniels' testimony that he knew Jana from a party, defense counsel asked the jury:

"Did Albert ever have sex with Jana? We don't know. Only Albert knows. There's—that's—this is the thing, you can't—you can't prove or disprove an affair, I mean, like—I know with—with—with President Clinton, he was impeached after they found some of his DNA."

26

Again, the State objected, and the court sustained the objection, telling defense counsel to "move on."

¶ 52 The defendant notes that at one point during closing argument, defense counsel intentionally raised the possibility that the defendant's family may have been involved in an unsolved murder. Defense counsel referred to one of the letters the defendant maintains were written at the request of Gecht, and tells the jury:

"Back to this letter. Okay. You guys are getting this letter. I asked that it be put in evidence. One thing he says right at the very beginning, I think I have some information about an unsolved murder that Tucker's family took part in. Back in 1991, a guy named Lamont and—"

¶ 53 Before defense counsel could finish, the State objected. The court sustained the objection and instructed the jury to disregard counsel's statement. The court gave a further instruction, telling the jury that what an attorney says in closing argument is not evidence. The defendant claims he was further prejudiced when his counsel allowed the entire Gecht letter, which contained allegations that the defendant's family killed someone in 1991 named Lamont, to go back to the jury room during deliberations. After reviewing the record, it appears that the State's objection to defense counsel's statements was made to protect the defendant from potential prejudice. We note that after the jury retired to deliberate, the State questioned whether defense counsel wanted the letter to go to the jury, and defense counsel reiterated he wanted the entire letter to go back to the jury. The letter did not advance the defendant's cause, nor did it test the prosecution's case. Rather, the implication from the letter was that the defendant may have been

27

inclined to commit murder because of his familial upbringing.

¶ 54   We recognize that counsel is given great latitude in his or her closing argument to the jury. *Leeper*, 317 Ill. App. 3d at 484. To show ineffectiveness as a result of comments made during closing argument, the defendant must overcome the strong presumption that his counsel was not incompetent and that his actions were a part of sound trial strategy. *People v. Davis*, 356 Ill. App. 3d 725, 730 (2005). A reviewing court evaluates the reasonableness of counsel's conduct from his perspective in light of the totality of the circumstances in the case. *Davis*, 356 Ill. App. 3d at 730; *People v. Daniels*, 331 Ill. App. 3d 380, 393 (2002). Even when defense counsel concedes the defendant's guilt during closing argument, the court will not presume prejudice unless the strategy amounted to a complete failure to subject the prosecution's case to meaningful adversarial testing. *People v. Milton*, 354 Ill. App. 3d 283, 290 (2004). In essence, counsel's choice does not constitute ineffective assistance of counsel simply because it was unsuccessful. *Milton*, 354 Ill. App. 3d at 290.

¶ 55   During closing argument, defense counsel's conduct was unprofessional, at best. Again, we are not willing to assume that counsel's argument was part of some unconventional defense strategy and that counsel's conduct had no impact on the jury.

¶ 56   In his postconviction petition and in this appeal, the defendant has argued that defense counsel's errors permeated every stage of his trial. He asserts that he is entitled to a third-stage evidentiary hearing because, through cumulative error, he has demonstrated a substantial showing of a constitutional violation. We agree. At this stage of the proceedings, the test is not whether the defendant had established actual prejudice under

28

*Strickland*. Rather, the analysis focuses on whether the allegations in the petition and supporting documents make a substantial showing that a constitutional violation occurred. In our view, the numerous errors outlined above entitle the defendant to a third-stage evidentiary hearing.

¶ 57   Criminal defense attorneys must assist clients in a way that the constitutional guarantee of "assistance of counsel" contemplates. The constitution contemplates assistance that engages evidentiary rules to shield an accused from a decision based upon unreliable evidence. *People v. Moore*, 279 Ill. App. 3d 152, 159 (1996). It contemplates assistance that appreciates and understands legal principles applicable to the case. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997). "It contemplates assistance ready to provide an adversarial check to a prosecutor's excessive endeavors." *Fletcher*, 335 Ill. App. 3d at 453. Accordingly, on the record before us, the defendant has made a substantial showing that his trial counsel's representation was substandard and that counsel's deficient performance may have had an effect on the outcome of the proceedings.

¶ 58   In his final point, the defendant alleges that he was deprived of effective assistance of appellate counsel because his appellate attorney failed to raise trial counsel's numerous errors in his direct appeal. Because we are remanding this case to the trial court for an evidentiary hearing on many of the defendant's claims of ineffective assistance of trial counsel, we are unable to determine whether appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel. Unless the underlying issues are meritorious, the defendant has suffered no prejudice from counsel's failure to raise those

29

issues on appeal. *People v. Foster*, 168 Ill. 2d 465, 474 (1995). The defendant shall be allowed to present his claims of ineffective assistance of counsel at the third-stage evidentiary hearing, including his claims of ineffective assistance of appellate counsel.

¶ 59                                    CONCLUSION

¶ 60    For the reasons stated, we reverse the judgment of the circuit court dismissing the defendant's postconviction petition without an evidentiary hearing, and we remand this cause of action for a third-stage evidentiary hearing.


¶ 61    Reversed and remanded with directions.

2017 IL App (5th) 130576

NO. 5-13-0576

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Jefferson County. |
| v. | ) ) | No. 02-CF-212 |
| JOE C. TUCKER, JR., | ) ) | Honorable David K. Overstreet, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Opinion Filed:**      May 30, 2017

**Justices:**      Honorable Judy L. Cates, J.

Honorable Melissa A. Chapman, J., and
Honorable John B. Barberis, J.,
Concur

**Attorneys for Appellant**

Michael J. Pelletier, State Appellate Defender, Jacqueline L. Bullard, Deputy Defender, John M. McCarthy, Assistant Appellate Defender, Office of the State Appellate Defender, Fourth Judicial District, 400 West Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240

**Attorneys for Appellee**

Hon. Douglas R. Hoffman, State's Attorney, Jefferson County Courthouse, 100 South 10th Street, Mt. Vernon, IL 62864; Patrick Delfino, Director, David J. Robinson, Deputy Director, Timothy J. Londrigan, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 725 South Second Street, Springfield, IL 62704