NOTICE
Decision filed 08/22/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220050-U

NO. 5-22-0050

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-CF-2969 |
| | ) | |
| GEORGE E. LACEY, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's counsel did not provide ineffective assistance by failing to request severance of the charges.

¶ 2    The defendant, George E. Lacey, was convicted of first degree murder and unlawful possession of weapons by a felon after a jury trial. The defendant appeals the convictions based on an ineffective assistance of counsel claim where trial counsel failed to sever the charge of unlawful possession of weapons by a felon from the remaining counts. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                          I. BACKGROUND

¶ 4    On the evening of November 19, 2020, Lauren Swearingen was in her apartment, washing dishes, when two men forced their way inside by kicking in the back door. One man approached Lauren and held her down against the floor. The other man confronted Lauren's boyfriend, Darian

1

Woods, who was coming down the staircase from upstairs. Darian was fatally shot in the chest as he descended, and fell on the stairs, sliding to the floor. The men then took thousands of dollars and cannabis from the apartment and fled.

¶ 5 On November 24, 2020, the defendant was charged by information with four counts of first degree murder (720 ILCS 5/9-1(a) (West 2020)), one count of home invasion (720 ILCS 5/19-6(a)(5) (West 2020)), one count of armed robbery (720 ILCS 5/18-2(a)(4) (West 2020)), and one count of unlawful possession of weapons by a felon (720 ILCS 5/24-1.1(a) (West 2020)). The defendant's arrest warrant was issued on November 30, 2020.

¶ 6 The State filed a notice of intent to introduce certified copies of the defendant's prior armed robbery conviction. The defendant had been convicted of armed robbery on September 1, 2015. See People v. Lacey, No. 13-CF-295 (Cir. Ct. St. Clair County). The defense filed a motion *in limine* to preclude the use of the prior conviction for impeachment of credibility of the defendant and argued that the defendant's prior conviction was prejudicial and had no bearing on credibility.

¶ 7 The circuit court held a pretrial conference and addressed the defendant's motion *in limine* to preclude the use of the defendant's prior conviction. The defense argued that the defendant was on trial for armed robbery and that the prior conviction for armed robbery would be used as propensity evidence. The State argued that the use of the defendant's prior conviction for armed robbery would be used for impeachment purposes if the defendant testified. Additionally, the State argued that it was obligated to present evidence of the prior charge because it was an element of the State's case where the defendant was charged as a felon in possession of a weapon. During the motion hearing, the circuit court questioned defense counsel about whether he was going to include the unlawful possession of a weapon by a felon charge in the trial. Defense counsel indicated that

he would defend the charge at trial and stipulated to the fact that the defendant was a convicted felon, without mentioning the underlying armed robbery offense.

¶ 8     The circuit court denied the defendant's motion *in limine*, allowing the State to introduce the defendant's armed robbery conviction for impeachment purposes if the defendant testified. If the defendant did not testify, the circuit court allowed the defendant to stipulate that he was a convicted felon, and the jury would not have knowledge of his prior armed robbery conviction.

¶ 9     On October 12, 2021, the trial began with jury selection. During jury selection, the circuit court addressed the parties outside of the presence of the jury panel regarding the unlawful possession of weapons by a felon count. The circuit court again inquired whether defense counsel wanted to proceed with the inclusion of that count at trial and defense counsel confirmed his position with the circuit court. The circuit court reiterated that the defendant was stipulating that he was a felon, and the jurors would not be informed of the nature of the prior conviction. The circuit court also reiterated that the defendant's prior armed robbery conviction would be allowed only for impeachment purposes.

¶ 10    The following day, after the jury was selected, the State presented its opening statement. The defense declined to present an opening statement prior to the presentation of the State's case. The State then called Officer Ben Koertge as its first witness. Officer Koertge was dispatched to the victim's residence on the evening of November 19, 2020, and secured the crime scene. Several photographs were taken of the outside of the apartment building, the deceased, and the interior of the apartment. The photographs were identified by the officer and admitted as evidence.

¶ 11    Lauren Swearingen testified that she lived with her boyfriend, Darian Woods, in Collinsville, Illinois. Darian sold cannabis out of their home. Lauren and Darian used Percocet and fentanyl. Their apartment had a "Ring door camera" that was activated by motion.

3

¶ 12    On the evening of November 19, 2020, Lauren and Darian were at home in their apartment, located on the ground floor of a residence. Lauren testified that she was washing dishes when she heard a loud noise. She turned around to see that her back door had been kicked in and two men entered her home. A man wearing a "covid mask" and dark clothing came towards her. Lauren threw her hands up and cowered down. The man put his hands around her neck and his knee into her back, holding her onto the kitchen floor, as she faced her refrigerator. The second man was wearing a white shirt and had "something red around his face." Lauren was able to determine that the men were Black, but she never saw their facial features, which were covered.

¶ 13    Lauren testified that the man in the white shirt "bolt[ed] up the stairs." She heard Darian running downstairs at the same time. Lauren testified that there was a "half of a second of just scuffling and then a pop." A gunshot. Lauren saw Darian slide down the stairs headfirst, struggling to breathe. The man in the white and red was searching the second floor of the apartment and yelled "where's the money." The man that had pinned Lauren to the ground grabbed Lauren by the neck and directed her upstairs. Lauren had to step over Darian's body to walk up the stairs. Once she reached the second floor, the man released his hold while Lauren walked towards where Darian kept the money in a laundry basket.

¶ 14    After Lauren located the money, the man in the white shirt grabbed what Lauren estimated was seven to ten thousand dollars from the laundry basket. This man also took a duffle bag containing cannabis and a blue bag of cannabis. Both bags were located in the upstairs bedroom closet. Lauren testified that she kept her eyes focused to the side, told the men that she had not seen them, and begged them not to hurt her. The man that had pinned her to the ground in the kitchen directed Lauren into a bedroom closet, told her not to move or say anything, and he closed

4

the closet door. Lauren heard their footsteps as they went downstairs. She called 911 from the closet.

¶ 15    When emergency medical services arrived, Darian no longer had a pulse. Lauren testified that she provided the police with videos from her security camera system. Two video clips from the security footage were published to the jury. Lauren identified the men on the videos as the same men that were in her apartment. Their faces were covered in the videos. The second video clip depicted the man in the white and red grabbing the outside security camera. Lauren identified that he had a gun in his pocket while he dismantled the camera.

¶ 16    During cross-examination, Lauren testified that Darian sold marijuana out of their apartment. Lauren was not familiar with everyone that came to the apartment. Darian also used fentanyl and sometimes his drug dealers would come to their apartment. Lauren knew of four additional times that Darian had been robbed. Lauren additionally testified that she did not recognize the defendant. Lauren clarified that the man in the white and red could have been the defendant, as he had the same build. Lauren admitted, however, that she was unable to identify the intruders because their facial features were covered.

¶ 17    Detective Kyle Graham testified to obtaining security footage from a business in Collinsville, Illinois, near the victims' apartment. Between 7:20 p.m. and 7:25 p.m. on November 19, 2020, a truck with a "fast blinking blinker" paused near where the incident occurred. The same truck was shown leaving the area when the 911 call was made by Lauren. Graham additionally obtained video footage from a gas station that had a side view of the color, make, and model of the truck. The information on the truck was sent to local law enforcement agencies as a vehicle of interest.

¶ 18    Michelle Werner testified to a Facebook Live video dated July 22, 2020. The defendant was on the video wearing shoes that appeared to be similar to the shoes shown in the video from the crime scene. A clip of the video was published to the jury and introduced into evidence.

¶ 19    Adisa Smith, the owner of the blue truck identified by law enforcement, also testified. Smith was 28 years old, and he attended the same high school as the defendant. Smith viewed the Facebook video and confirmed that the defendant was in the video.

¶ 20    Smith testified to the events that occurred on November 19, 2020. Earlier in the day, Smith had contacted Matthew Drake, his friend and mechanic. Drake was drinking with the defendant and Demandrell Davis. Smith joined and they drank together for several hours. During that time, they did not discuss or plan any crimes. Smith testified that he noticed the defendant was carrying a gun.

¶ 21    Smith indicated that the defendant had offered Smith $50 for a ride. Smith agreed and drove the defendant and Davis to Collinsville, Illinois. The defendant directed Smith to drop the defendant and Davis off at an apartment building and to back in his truck to park. Smith testified the defendant's instruction seemed "a little weird." After the defendant and Davis exited the truck, Smith drove to the next intersection to turn around and then returned to the apartment complex to pick up the defendant and Davis. Smith waited approximately three to five minutes for the defendant and Davis. When the two men returned to the truck, they appeared "very nervous" and had a reusable shopping bag that "smelled like all weed."

¶ 22    Smith testified that the defendant directed Smith to a gas station in St. Louis, Missouri. When they crossed the I-70 bridge, the defendant "wrapped something up and threw it in the river." The defendant additionally told Smith and Davis that "if word got back that I [Smith] brought him to this apartment, he was gonna kill both of us."

6

¶ 23 Smith was shown a video taken from the gas station and he confirmed that the video depicted his truck pulling into the gas station. Smith testified that he went inside the gas station while the defendant and Davis remained in the truck. The defendant sat in the passenger seat and wore a long-sleeved white shirt. The video did not clearly depict the passengers that remained in the truck. The gas station videos were published and admitted into evidence. Smith testified that after he left the gas station, he drove the defendant and Davis back to Davis's house. The defendant gave Smith $50 and cannabis for the ride.

¶ 24 Four days after the incident, Smith was pulled over by the St. Clair County Sheriff's Department. Smith was arrested and his truck was towed. Smith testified that he was interviewed by the police on November 23, 2020. During the interview, Smith provided the police with a physical description of the defendant.

¶ 25 Smith admitted that he had lied to the police during his first interview. Smith told the police that he had rented his truck to the defendant for the night and Smith was not involved with what had happened. Smith additionally told the police that the defendant's cousin was involved, and not Davis, but that was not true. Smith was charged with accessory to murder, home invasion, and robbery. Smith pleaded guilty to armed robbery and the State agreed to recommend a sentence of 10 years in the Illinois Department of Corrections. Smith testified that he had lied to the police because he did not want to get in trouble. Smith additionally testified that he was telling the truth in court and that he had received a deal to serve 10 years in prison for the armed robbery conviction.

¶ 26 An expert in forensic pathology performed Darian Woods's autopsy and testified that the cause of death was a gunshot wound of the chest. The manner of death was homicide. Darian had abrasions on his head consistent with being struck with a firearm or fist. Darian had no injuries to his hands, or signs of Darian striking anyone. The soot found around the bullet wound

demonstrated that Darian was shot at close range, within a foot. The gun could have loosely touched Darian's body when fired. The gunshot wound tracked through the upper part of the sternum, through the left upper lobe of the lung, through the aorta, and through the spine. Darian experienced instantaneous paralysis and because the bullet transected the aorta, Darian would have died within minutes of the injury. A bullet was recovered from Darian's body.

¶ 27 Detective Michael Hentze was a crime scene investigator with the Illinois State Police. Detective Hentze testified that he found a "Ring doorbell camera" in a recycling bin outside of the apartment complex. He photographed the camera, and the camera was collected and taken to the crime lab. Detective Hentze took additional photographs of the crime scene and collected a fired cartridge case as evidence. Drug paraphernalia was found in the apartment, but no firearms or ammunition were recovered. Detective Hentze additionally collected the bullet obtained during the autopsy. He was also involved with the search of Smith's blue truck. During the search of the truck, an Illinois Link card with the name Demandrell Davis was recovered. Detective Hentze did not recover any items belonging to the defendant from the apartment or from the truck.

¶ 28 Officer Nicole Dwyer with the Collinsville Police Department testified that she booked and fingerprinted the defendant. The defendant's fingerprint samples were sent to the crime lab for a comparison.

¶ 29 Melissa Gamboe, with the Illinois State Police forensic science lab, testified to examining the "Ring doorbell camera." A latent fingerprint was found on the camera. She compared the collected fingerprint to the sample received from the defendant and concluded that the latent print on the "Ring doorbell camera" was made by the defendant. Gamboe testified that she was not able to determine when the fingerprint was made, "but the likelihood of them staying on a doorbell that is outside decreases each day because of the environmental conditions."

¶ 30 Angela Horn with the Metro East Forensic Science Laboratory in Belleville, Illinois, testified that she analyzed the recovered bullet from Darian's body and the bullet casing from the crime scene. Horn was unable to determine what type of firearm fired the bullet as the firearm was not recovered. The recovered cartridge case was a .40-caliber, possibly 10-millimeter, and was marked Smith and Wesson. The State rested after Horn testified.

¶ 31 The defense presented a motion for a directed verdict. The circuit court denied the motion for a directed verdict. The defendant did not testify on his own behalf and the defense did not present any additional evidence.

¶ 32 During closing argument, the State argued that the defendant committed first degree murder, where he put a gun to Darian Woods's chest and pulled the trigger at close range. Additionally, the defendant knowingly possessed a firearm and he had admitted to having been convicted of a previous felony. The State played the video from the security camera and argued that the video was of the defendant with a gun in his front right pocket. The State's closing argument also included that the defendant left his fingerprint on the security camera.

¶ 33 The defense argued that the evidence presented did not place the defendant at the crime scene. He argued that Adisa Smith was the only witness that testified that the defendant was present at Darian Woods's apartment, and his testimony was not believable. The forensic scientist was unable to determine how long the fingerprint was on the camera. Darian Woods sold cannabis out of his apartment and purchased fentanyl. Lauren Swearingen did not know everyone that had been to the apartment to meet with Darian. The defense insinuated that the defendant could have been at the apartment to purchase cannabis or sell fentanyl prior to the night of the incident and left his fingerprint on the "Ring doorbell camera" on a different occasion.

9

¶ 34    While the jury was deliberating, they sent a note to the circuit court which stated, "the jurors are currently 10-2 that [the defendant] was at the scene. We have come to a standstill. The two against say there isn't enough evidence to say he was there, fingerprint is not enough." The circuit court then sent the jurors home for the evening at approximately 8:30 p.m.

¶ 35    The jurors continued deliberation the following morning. The jurors sent a note to the circuit court that stated, "1) What was the felony charge in 2015?" and "2) Transcript of Adisa Smith's testimony." For the first question, the circuit court responded that the jurors had received all of the evidence in this case. For the second question, the circuit court instructed the jury that they should rely on their recollection of the testimony.

¶ 36    The jurors subsequently submitted a third note which stated, "what happens if we agree on 2 counts, but are hung on the remainder?" The circuit court noted that the jurors had deliberated longer than the presentation of evidence in the case. The jurors were provided lunch and continued to deliberate. The jurors subsequently submitted a final note to the circuit court which stated, "We have come to an agreement on two of the charges and we are hung on the last three and do not feel anything will change." When the circuit court read the note, the court clarified with counsel that there were four felony charges and a question posed to the jury on whether the defendant had discharged the firearm. There were five issues that the jury had to decide. They had evidently reached an agreement on two of the issues. The circuit court did not believe further deliberations would be productive, and the jurors returned to the courtroom. The jurors found the defendant guilty of first degree murder and unlawful possession of weapons by a felon. The court declared a mistrial as to the charges of home invasion and armed robbery.

¶ 37    The defense filed a posttrial motion for a new trial which was denied by the circuit court. On January 27, 2022, the defendant was sentenced to consecutive sentences of 45 years for the

charge of first degree murder and 7 years for the charge of unlawful possession of weapons by a felon. This appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, the defendant argues that defense counsel rendered ineffective assistance of counsel for failing to sever the unlawful possession of weapons charge from the remaining felony counts. The defendant claims that the evidence of a prior conviction improperly influenced the jury in finding the defendant guilty of murder.

¶ 40    Criminal defendants have a constitutional right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15. Claims of ineffective assistance of counsel are governed by a two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44. Where an ineffective assistance of counsel claim has not been raised before the circuit court, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 41    To establish deficient performance of counsel, the defendant must overcome the strong presumption that defense counsel's actions were the product of sound trial strategy and not incompetence. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. Representation will not be considered ineffective based on mistakes in trial strategy or judgment alone as a defendant is entitled to "competent, not perfect, representation." *Tucker*, 2017 IL App (5th) 130576, ¶ 26. "In establishing the prejudice prong, the defendant must show that there is a reasonable probability that, but for his attorney's deficient performance, the result of the proceedings would have been different." *Tucker*, 2017 IL App (5th) 130576, ¶ 26. If we find that the defendant failed to satisfy

11

the first prong of *Strickland*, we need not consider the second prong of whether the deficient performance resulted in prejudice. *People v. Torres*, 228 Ill. 2d 382, 395 (2008).

¶ 42   Generally, charges arising out of the same incident may be tried together (725 ILCS 5/114-7 (West 2022)), unless it appears that the defendant will be prejudiced thereby (725 ILCS 5/114-8(a) (West 2022)). The circuit court has broad discretion in its decision to grant or deny a motion to sever. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 38.

¶ 43   The defendant relies on *People v. Edwards*, 63 Ill. 2d 134 (1976), in support of his claim that the circuit court would have granted a motion to sever had defense counsel filed the motion. In *Edwards*, the Illinois Supreme Court found that "the joinder of the armed robbery and the felonious unlawful use of a weapon charges created such a strong possibility that the defendant would be prejudiced in his defense of the armed robbery charge that it was an abuse of the trial court's discretion to deny a severance." *Edwards*, 63 Ill. 2d at 140. The *Edwards* case was specific to whether the circuit court erred in denying a severance; ineffective assistance of counsel was not at issue. *Edwards*, 63 Ill. 2d at 138.

¶ 44   The defendant recognizes that an attorney's performance will not be found deficient if it was based upon sound trial strategy. *Strickland*, 466 U.S. at 689. "Generally, a defense decision not to seek a severance, although it may prove unwise in hindsight, is regarded as a matter of trial strategy." *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10. The defendant argues that where the trial strategy is unsound the defense counsel's performance will be found deficient. See *People v. McMillin*, 352 Ill. App. 3d 336, 346-47 (2004). The trial strategy presumption is overcome "where no reasonably effective criminal defense attorney, confronting trial's circumstances, would engage in similar conduct." *McMillin*, 352 Ill. App. 3d at 344.

12

¶ 45 Illinois law recognizes that when deciding whether to seek a severance, trial counsel may choose an "all or nothing" trial strategy, where the defendant is acquitted or convicted of all charges in a single proceeding. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28. "The mere fact that an 'all-or-nothing' strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance." *Fields*, 2017 IL App (1st) 110311-B, ¶ 28. A defendant may be disadvantaged by severing a case where an evidentiary deficiency in the first case could potentially be cured in the second case. *Poole*, 2012 IL App (4th) 101017, ¶ 10. We also consider that " '[p]erhaps trial counsel felt that it made sense to try for an acquittal of both counts in one proceeding, thinking that the impact of the additional conviction would not be significant.' " *Poole*, 2012 IL App (4th) 101017, ¶ 10 (quoting *People v. Gapski*, 283 Ill. App. 3d 937, 943 (1996)).

¶ 46 Defense counsel addressed the defendant's prior armed robbery conviction during the hearing on his motion *in limine* to prohibit the use of the conviction if the defendant testified. The circuit court denied the motion and the defendant's conviction of armed robbery would have been admissible only if the defendant testified. During the motion hearing, the circuit court additionally addressed whether the unlawful possession of a weapon by a felon charge would be included at trial. The defense did not seek to sever the charge and sought to minimize the prejudice of the prior conviction by stipulating that the defendant was a convicted felon without informing the jury that the defendant had a prior armed robbery conviction. The circuit court addressed this issue again during jury selection. Defense counsel confirmed that he wished to proceed by stipulating that the defendant had a prior conviction. The defense counsel's decision to stipulate to the prior felony indicates that the decision not seek a severance of the felony claims was a matter of trial strategy.

¶ 47 The defense employed an "all-or-nothing" trial strategy while presenting a theory that there was insufficient evidence to place the defendant at the crime scene during the time of the murder. Evidence demonstrated that the victim sold drugs to numerous people at his apartment and abused fentanyl. Defense counsel argued that the expert witness could not determine a date for the defendant's fingerprint; the defendant may have left his fingerprint at the apartment at an earlier time; and, insinuated that the defendant may have purchased drugs from the victim in the past. Perhaps defense counsel considered that it made sense to try for an acquittal of all counts in one proceeding where the impact of an unknown prior conviction may not be significant considering that the defendant's fingerprint was found at a location associated with illegal drug activity.

¶ 48 Accordingly, the defendant has failed to overcome the strong presumption that defense counsel's decision to not pursue a motion to sever was a matter of sound trial strategy. Thus, we conclude that the defendant did not receive ineffective assistance of counsel where counsel's performance was not deficient, and we need not consider whether defendant was prejudiced.

¶ 49                                    III. CONCLUSION

¶ 50 For the reasons stated above, we conclude that the defendant did not receive ineffective assistance of counsel and affirm his conviction and sentence.

¶ 51 Affirmed.