NOTICE

Decision filed 01/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240696-U

NO. 5-24-0696

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 23-CF-622 |
| | ) | |
| SHAUNDRELL BROWN, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.*

**ORDER**

¶ 1    *Held*:    Where the defendant failed to establish ineffective assistance of counsel for failure to file a motion to sever, and the trial court did not rely on improper sentencing factors, we affirm the defendant's convictions and sentence.

¶ 2    On May 18, 2023, the defendant, Shaundrell Brown, was charged by information with two counts of attempt (720 ILCS 5/8-4(a) (West 2022)), alleging he took a substantial step toward the commission of first degree murder (*id.* § 9-1(a)(1)), without lawful justification, with the intent to kill both Alexander Brown and Calvin Dooley. The information alleged the defendant personally discharged a firearm (*id.* § 8-4(c)(1)(D)) that proximately caused great bodily harm, permanent

---

*Originally Justice Moore was assigned to the panel. Justice Vaughan was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

disability, or permanent disfigurement in both counts. On August 2, 2023, after a jury trial, the defendant was found guilty of both counts in the information. The defendant was sentenced to 40 years in the Illinois Department of Corrections (IDOC) on count I and 35 years IDOC on count II, to be served consecutively at 85%. For the following reasons, we affirm the defendant's convictions and sentence.

¶ 3                                                I. BACKGROUND

¶ 4      We recite only those facts relevant to the issues on appeal. On May 18, 2023, the defendant was charged by information with two counts of attempted first degree murder (*id.* §§ 8-4(a), 9-1(a)(1)). Count I alleged that on November 13, 2015, the defendant took a substantial step toward the commission of first degree murder when he fired a gun in the direction of Alexander Brown (Brown) that proximately caused bodily harm, permanent disability, or permanent disfigurement to Brown. Count II was identical to count I, except the alleged victim was Calvin Dooley. On May 22, 2023, attorney Jeffrey Cisco (Cisco) entered his appearance on behalf of the defendant. On July 31, 2023, a jury trial began and produced the following evidence.

¶ 5      Officer Arthur Miller of the Champaign Police Department testified that at approximately 8:59 p.m. on November 13, 2015, he responded to a call of "shooting with injuries, gunshot victim" at 1206 North Hickory Street. Upon Officer Miller's arrival, Tashiba Blakely (Tashiba) "flagged" him down and let him into her residence. Officer Miller observed the victim, Brown, lying on the floor in the living room, bleeding from two gunshot wounds, one to the buttocks and one to the thigh. Brown was uncooperative, and when asked what happened, Brown shouted: "Fuck that. Get me the fuck out of here." Eventually, Brown informed Officer Miller that he had been shot on the porch. Brown was hospitalized for more than one month. He sustained five gunshot wounds; one of the bullets lodged in Brown's appendix, which had to be removed.

¶ 6    Tashiba testified that prior to Brown being shot at her house, there was a paintball shooting incident. She did not see who shot the paintballs at her house but described the blue-colored paint damage on her front porch. A photo of the damage was admitted into evidence and published to the jury. Tashiba also testified the defendant shot a paintball gun at her daughter-in-law, and although she did not see who damaged her porch, she was present "when we got the phone call that [the defendant] was coming to see somebody that was in my house" on November 13, 2015. Tashiba identified the defendant in a photo line-up following the shooting and during her in-court testimony.

¶ 7    Detective Jeremiah Christian testified that he conducted a photo line-up with Brown at the hospital on November 17, 2015, which was recorded on his cell phone. This video, which was admitted into evidence and published to the jury over defense counsel's objection, shows Brown circling a picture of an individual in the photo line-up, placing his initials next to it, and signing it. Brown identified the defendant as the person who shot him.

¶ 8    Detective Bradley Krauel testified that he conducted a full interview of Brown on November 19, 2015, which was audio-recorded. Three portions of this recording were admitted into evidence and published to the jury. In this interview, Brown said that he recognized the defendant, who he knew by only his first name, "Shaundrell," as the shooter. Brown said he was hanging out at Tashiba's house when the defendant "came through in a white truck playing with his paintball gun." One of the paintballs hit Brown, and he asked the defendant, "Can you stop shooting over here with that paintball? There's kids up here and stuff, one of the paintballs actually went into the house." The defendant left for five minutes but returned and continued to shoot paintballs at Tashiba's house. Brown and the defendant then engaged in a verbal argument. Brown

3

said that the defendant then began "talking crazy," saying things like "alright, I'll be back," and "don't leave then, n***."

¶ 9 Brown said that he was not "thinking that, you know, [the defendant] gonna come back with a gun and try to kill me or whatever," since "he just shot [him] with a paintball gun." Brown remained at the residence, and when he stepped outside 15 minutes later to smoke a cigarette, he was shot in the calf. Brown told Detective Krauel that he was shot three more times before he fell to the floor, crawled into the house, and asked someone to call an ambulance. Brown said he did not see the person who shot the firearm at him but believed it was the defendant. Brown also told Detective Krauel that he saw the defendant in a white vehicle.

¶ 10 Detective Sergeant David Griffet testified that after a conversation with Tashiba, police conducted surveillance on a white 2009 Toyota Highlander. The vehicle was initially spotted leaving a residence at 1205½ North Linview in Urbana. Police stopped the vehicle at a motel and spoke with two occupants, neither of whom were the registered owners of the Highlander. Two blue paintballs were discovered inside the vehicle. Later that day, a search warrant was executed at 1205½ North Linview, during which officers seized a paintball gun loaded with blue paintballs, multiple bags of blue paintballs, a factory box for a Glock 26 handgun containing three magazines, and four pieces of mail, one belonging to the defendant.

¶ 11 The State next called Brown to testify. Brown said he was drinking alone outside at Tashiba's house when he was shot. He said he was shot five times and did not see the person who shot him. He acknowledged that officers asked him if he saw the shooter. Brown testified that he did not recall identifying the defendant in a photo line-up and did not recall most of the interview with Detective Krauel. On cross-examination, Brown stated that he was intoxicated at the time of the shooting. Brown testified that he was present under subpoena and did not want to be there.

4

¶ 12    David Dillman testified that, while mowing a lawn for Illinois Title located at Prospect Avenue, he heard "popping." He then saw two vehicles, a Monte Carlo and a white Toyota SUV, appear to have collided. The white Toyota sped off, and a skinny, black male "hopped" to the side of the road from the Monte Carlo. The State showed Dillman People's Exhibit 10B, a photo of a white Toyota SUV, asking if that was one of the vehicles he saw. Dillman replied, "That looks like it."

¶ 13    Officer Brian Ahsell testified that he responded to a call of shots-fired in the 1300 block of North Prospect. While en route, Officer Ahsell was flagged down by the driver of a silver Nissan Altima, where Calvin Dooley was in the passenger seat of that vehicle with a gunshot wound. Dooley was transported to the hospital, and while there, he told Officer Ahsell that the person who shot him was in a white SUV. Dooley stated that although he did not know the shooter, he would be able to recognize him if he saw him again.

¶ 14    Officer Dustin Simpson testified that he spoke with Dooley at the hospital later that day. This conversation was not recorded, but Officer Simpson testified that Dooley was confident he could identify the shooter in a photo line-up. Now recording, Officer Simpson presented Dooley with a photo line-up, and Dooley identified the defendant as the person who shot him. He stated that no one else was in the vehicle with the defendant. A search was conducted on Dooley's vehicle, and officers determined that bullets entered into the Monte Carlo from a "downward angle," indicating that they were shot from a higher vantage point.

¶ 15    The State next called Dooley to testify, who said that he was under subpoena and "definitely [did not]" want to be in court. Dooley testified that he was shot and that one of his friends took him to the hospital after flagging down the police. He said that he did not see the person who shot him, nor did he know where he was shot from. He testified that he did not

remember initialing or signing the photo line-up where he identified the defendant as the person who shot him.

¶ 16    A stipulation was entered into evidence concerning the ballistics examination of four projectiles. One was a bullet retrieved from Brown's person and the other three were retrieved from Dooley's vehicle. All four bullets were determined to have been fired from the same gun.

¶ 17    The jury found the defendant guilty of both counts of attempted first degree murder. On August 25, 2023, the defendant file a *pro se* motion for a new trial, and on September 1, 2023, Cisco filed a "Motion to Set Aside Verdicts and Dismiss Charges, or in the Alternative, Motion for Acquittal, or in the Alternative, Motion for New Trial." On September 13, 2023, Cisco withdrew as counsel, and Vadim Glozman (Glozman) entered his appearance on behalf of the defendant.

¶ 18    On January 29, 2024, Glozman filed a "Supplemental Motion to Set Aside Verdicts and Dismiss Charges, or in the alternative, Motion for Acquittal, or in the alternative, Motion for New Trial," which raised claims of ineffective assistance of trial counsel, failure to prove the defendant guilty beyond a reasonable doubt, and error in admitting the prior recorded statement of Brown.

¶ 19    On April 29, 2024, the trial court held a hearing on Glozman's motion. Glozman called Cisco to testify. Cisco stated he had been practicing law for 20 years and primarily handled criminal and personal injury cases. He testified that he "would do legal research on most cases that [he] prepare[d] for." He stated, "[A]t some point I definitely researched the compulsory joinder issues and, you know—I might have refreshed myself on general speedy trial issues, perhaps." He testified that he believed he remembered "there was evidence that the same gun was used in both" shootings.

6

¶ 20    Cisco stated that he was familiar with the law relating to severance. When Glozman questioned Cisco about why he did not "ask the Judge to instruct the jury to consider the charges separately," he said, "Well I mean from a trial strategy standpoint, again, whether it's right or wrong, I was really going for—I mean, even one conviction would be devastating for him in terms of length of time, and I was really going for an acquittal on both." When Glozman continued to question Cisco about the defendant's potential sentence if convicted, Cisco testified, "[T]here's a difference [between 31 years IDOC and 62 years IDOC], but from a trial strategy standpoint, I didn't want the jury to, to split the baby and say, well, we'll convict him on one and not the other. I really wanted to go for the jugular ***."

¶ 21    Glozman asked Cisco if "this whole trial strategy thing is kind of a retrospective look at it instead of" what he was thinking at the time. Cisco stated that he "would disagree with that contention with respect to this issue. *** [He] felt it was very important to try to get an acquittal on both counts." Cisco also said that he "felt it would give the State two bites at the apple" if he tried the two counts separately, giving the State an advantage. Cisco testified that the State only has "to be right on one of them for [his] client essentially to spend a substantial time in prison."

¶ 22    After arguments, the trial court made the following statements concerning severance of the counts:

> "Well, you say that there's no similarities between the two. You're talking about just—you're talking about just the prejudice, but there are a lot of factors that the Court has to use to determine whether to sever charges. And you've said that the only thing is the Defendant and potentially I guess you said the gun, right?
>
> ***

7

\*\*\* They were about a mile apart. Same gun. The bullets matched. Same white SUV were [*sic*] used in both areas. Both witnesses tell the police we think we know who did it, with photo arrays and whatnot, and then they both come in here uncooperative."

¶ 23 The trial court took the matter under advisement and on May 7, 2024, issued a seven-page order denying the defendant's posttrial motion. In that order, the trial court includes an analysis of prior recorded statements, proof beyond a reasonable doubt, and ineffective assistance of counsel. The court noted that "[t]he defense argument [was] inconsistent with the evidence at trial." When discussing the ineffective assistance of counsel claim, the trial court concluded that it was a "close call" but the two shootings were "not part of the same comprehensive transaction," and they could have been severed. The trial court found that "Cisco's actions fell below the level of a reasonable attorney."

¶ 24 The order finally addressed any prejudice caused by Cisco's failure to sever the two counts, stating

"that prejudice is not whether the Court would have granted the Motion to Sever or whether it cannot be determined whether the jury considered facts of one shooting when considering the other shooting. Rather, the test for prejudice in the context of a Motion to Sever, is whether Defendant can demonstrate a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. In other words, Defendant must show that, if tried separately, juries would find Defendant not guilty on one or both of the shootings.

This Court has already discussed the evidence in his case as it relates to both shootings and found that a jury could have found Defendant guilty beyond a reasonable doubt as to both. In its analysis above, this Court separated the evidence for each of the

8

two victims. Defendant stresses that neither victim testified that Defendant was the shooter. This is common-place in shootings and domestic battery cases. Nonetheless, in many of these cases, as here, the victims made recordings wherein they identify the perpetrator. These prior statements are introduced as substantive evidence and can be considered by the jury for that purpose. Juries convict people every day in this country even though witnesses change their stories. Anything is possible. The issue is reasonable probability. This Court finds that Defendant cannot demonstrate a reasonable probability that a jury would not convict Defendant in one or both of the counts if they were tried separately. Defendant cannot show prejudice."

¶ 25     On May 29, 2024, the trial court held a sentencing hearing. In aggravation, the State presented testimony from several officers. Urbana Police Detective Doug Pipkins testified that on July 30, 2021, Victor Hunt (Hunt) was shot and killed in a potential gang-related incident. A witness reported being threatened by three armed men demanding information and identified the vehicle they were driving. That vehicle was later searched, where officers found three firearms, which were sent to the Illinois State Police crime laboratory for analysis. One of the recovered firearms, a Glock 19, contained DNA from the defendant. During later questioning, the defendant said he was in Atlanta, Georgia, at the time Hunt was killed. The police determined that the Glock 19 with the defendant's DNA had been stolen in Atlanta, Georgia.

¶ 26     Champaign County Sheriff's Detective Cory Christenson testified that on September 17, 2020, officers responded to a report of shots fired at the Ivanhoe trailer park in Urbana. Renisha Davis (Davis), the mother of one of the defendant's children, told officers she and the defendant had been arguing when she accidentally struck a vehicle near him with her car. As she drove away,

the defendant fired seven shots at her. This was corroborated by a witness who also provided home surveillance footage showing the defendant shooting at Davis's vehicle.

¶ 27    Champaign Police Detective Lane Carpenter testified that on June 7, 2022, officers received a tip that defendant was living at and was selling heroin from a local residence. The tip indicated that the prior resident who sold heroin there had recently been incarcerated, and the defendant took over the operation. Police executed a search warrant that day, recovering heroin, fentanyl, a Smith & Wesson 9-millimeter handgun, ammunition, cash, and a cell phone. That cell phone was analyzed, linking it to the defendant. Detective Carpenter testified that based on the defendant's communications with known gang members, he considered the defendant an associate of a gang, MOB. Additionally, the Glock 19 with the defendant's DNA was used in the murder of Eric Kirk, a known rival to the MOB gang. The State argued that the defendant had a significant criminal history and recommended a sentence of 90 years in IDOC.

¶ 28    In aggravation, the trial court noted, in regard to the defendant's gang affiliation, the shared possession of the Glock 19, living in each other's houses, and riding in vehicles together. The trial court stated that the defendant was "[p]erhaps one of the most dangerous individuals in Champaign County." In mitigation, the trial court considered that the defendant was "still a relatively young man" who had children and did not have severe alcohol or drug problems. However, the court recognized that there was "very little mitigation," and "significant aggravation." Based on the findings that both victims suffered severe bodily injuries, the trial court determined the defendant's sentence would be mandatorily consecutive. The court also stated that even absent severe bodily injury, considering the nature and circumstances of the offenses and the history and character of the defendant, a discretionary consecutive sentence would still have been necessary to protect the public from further criminal conduct by the defendant. The trial court sentenced the defendant to

10

40 years in IDOC on count I and 35 years on count II, for a total of 75 years to be served at 85%. The defendant filed a motion to reconsider sentence, which was denied. The defendant timely appealed his convictions and sentence.

¶ 29                                          II. ANALYSIS

¶ 30                          A. Ineffective Assistance of Counsel

¶ 31    The defendant argues that he received ineffective assistance of counsel where defense counsel failed to file a motion to sever the counts against him. Criminal defendants have a constitutional right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15. Claims of ineffective assistance of counsel are governed by a two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44.

¶ 32    To establish deficient performance of counsel, the defendant must overcome the strong presumption that defense counsel's actions were the product of sound trial strategy and not incompetence. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. Representation will not be considered ineffective based on mistakes in trial strategy or judgment alone as a defendant is entitled to "competent, not perfect, representation." *Id.*

¶ 33    Here, during the posttrial motion hearing, trial counsel, Cisco, testified that he was familiar with the law on severance and that he was "really going on an acquittal on both" when deciding whether or not to sever the two counts for trial. After continued questioning by the defendant's posttrial counsel, Cisco reiterated that he "didn't want the jury to, to split the baby" and "convict him on one and not the other." Noting the similarities in the two counts and stating that it was a

11

"close call," the trial court said the two shootings were "not part of the same comprehensive transaction." The trial court concluded that the two counts could have been severed, and Cisco's failure to file a motion to do so, "fell below the level of a reasonable attorney." We disagree.

¶ 34     We find guidance in this court's recent decision in *People v. Lacey*, 2023 IL App (5th) 220050-U, which addressed the issue of the decision to sever counts as trial strategy:

> "Illinois law recognizes that when deciding whether to seek a severance, trial counsel may choose an 'all or nothing' trial strategy, where the defendant is acquitted or convicted of all charges in a single proceeding. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28. 'The mere fact that an "all-or-nothing" strategy proved unsuccessful does not mean counsel performed unreasonably and rendered ineffective assistance.' *Fields*, 2017 IL App (1st) 110311-B, ¶ 28. A defendant may be disadvantaged by severing a case where an evidentiary deficiency in the first case could potentially be cured in the second case. *Poole*, 2012 IL App (4th) 101017, ¶ 10. We also consider that ' "[p]erhaps trial counsel felt that it made sense to try for an acquittal of both counts in one proceeding, thinking that the impact of the additional conviction would not be significant." ' *Poole*, 2012 IL App (4th) 101017, ¶ 10 (quoting *People v. Gapski*, 283 Ill. App. 3d 937, 943 (1996))." *Lacey*, 2023 IL App (5th) 220050-U, ¶ 45.

This court will not "Monday morning quarterback" trial counsel's strategy in choosing not to sever the two counts of attempted murder at trial. Trial counsel testified clearly that he made the strategic decision not to file a motion to sever but instead to seek an acquittal on both counts, which guided the remainder of his trial strategy. We find that this decision was not objectively unreasonable. Because the defendant failed to satisfy the first prong of *Strickland*, we need not consider the prejudice prong. *People v. Torres*, 228 Ill. 2d 382, 395 (2008).

12

¶ 35                                    B. Sentencing

¶ 36     The defendant next argues that the trial court abused its discretion by considering other crimes allegedly involving the defendant, despite the State's failure to establish his role or responsibility in any of these incidents. The State argues that the trial court rightly considered all evidence presented, and the sentence falls well within the statutory range.

¶ 37     "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). The defendant acknowledges that though trial counsel objected to the trial court's use of the allegedly improper factors during sentencing, he failed to include this argument in his motion to reconsider sentence. The State contends that the defendant has therefore forfeited this argument. To avoid forfeiture, the defendant asks us to review his claim as first prong plain error.

¶ 38     When a defendant fails to preserve a claim of sentencing error, we may review the claim only if the defendant establishes plain error. *Id.* at 545. The plain-error doctrine is a narrow and limited exception to the general rule of forfeiture applicable to unpreserved claims. *Id.* Under the plain-error rule, a reviewing court will review an unpreserved sentencing error when a clear or obvious error occurs, and: (1) the evidence at the sentencing hearing was closely balanced; or (2) the alleged error was so serious as to deny the defendant a fair sentencing hearing. *Id.* The first step in plain-error review is to determine whether there was clear or obvious error. *People v. Moon*, 2022 IL 125959, ¶ 22.

¶ 39     In general, where, as here, a sentence imposed by the trial court is within the statutory limits for the offense, we will not disturb the sentence absent an abuse of discretion by the trial court. *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8. The reviewing court gives the trial court great deference when reviewing a sentence because the trial court is generally in a better position

than the reviewing court to determine the appropriate sentence. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). The trial court is given this level of deference because it is in a better position to weigh such factors as defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). A sentence will be deemed excessive and the result of an abuse of discretion where it is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). Although a reviewing court has the power to reduce or alter a sentence, this power should be exercised cautiously and sparingly. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 40　　The Unified Code of Corrections sets out certain statutory factors in aggravation and mitigation that a trial court must consider when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020). In fashioning the appropriate sentence, the court must carefully consider all of the factors in aggravation and mitigation, and other factors, such as defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *Calhoun*, 404 Ill. App. 3d at 385. However, of the factors in sentencing, "[t]he seriousness of the crime is the most important factor in determining an appropriate sentence." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). "It is well established that the ordinary rules of evidence are relaxed during sentencing hearings. [Citation.] Evidence may be admitted so long as it is both relevant and reliable." *People v. Varghese*, 391 Ill. App. 3d 866, 873 (2009). "In addition to considering a defendant's previous convictions, a sentencing court routinely considers crimes of which the defendant has not been convicted, including crimes for which the defendant has not been prosecuted." *People v. Rose*, 384 Ill. App. 3d 937, 941 (2008)

14

(citing *People v. Jackson*, 149 Ill. 2d 540, 548 (1992)). "Proof of prior misconduct not resulting in prosecution or conviction is admissible as relevant to the question of defendant's character." *People v. Johnson*, 114 Ill. 2d 170, 205 (1986). Unless the sentence is grossly disproportionate to the nature of the offense committed, it should be affirmed. *People v. Kendrick*, 2023 IL App (3d) 200127, ¶ 50.

¶ 41 Having carefully reviewed the testimony from the sentencing hearing, we are not persuaded that the trial court committed a clear or obvious error. Detectives Pipkins, Christenson, and Carpenter testified regarding their respective investigations into the defendant's involvement in various other crimes, and all three witnesses were subject to cross-examination. Pipkins testified to the defendant's ties to known gang members and that the defendant's DNA was found on a Glock 19 used in the commission of a gang-related murder. That gun was stolen from Atlanta, Georgia, where the defendant claimed to have been on the night of that murder. Christenson testified that the defendant shot seven times at his prior paramour's vehicle while she was driving away; this shooting was captured on video by a neighbor's surveillance system. Carpenter testified that after obtaining a search warrant on a house inhabited by the defendant, he located heroin, fentanyl, a gun containing the defendant's DNA, ammunition, cash, and the defendant's cell phone, which contained text messages further connecting the defendant to a gang.

¶ 42 When weighing all the factors of aggravation and mitigation, we find that the trial court did not commit a clear or obvious error by considering the defendant's involvement in uncharged criminal activity as an aggravating factor. The minimum sentence for each conviction was 31 years, and the maximum was life imprisonment. The trial court sentenced the defendant to 40 years on count I and 35 years on count II, well within the applicable sentencing range. We acknowledge that sentences within the statutory range can still be "greatly at variance with the spirit and purpose

15

of the law, or manifestly disproportionate to the nature of the offense," but we do not find such variance here. (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We find that the sentence imposed by the trial court was neither greatly at variance with the spirit and purpose of the law nor manifestly disproportionate to the nature of the offense.

¶ 43                                III. CONCLUSION

¶ 44     For the foregoing reasons, we affirm the defendant's convictions and sentence.


¶ 45     Affirmed.